Jane DOE and John Doe, Plaintiffs,

v.

### The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.

Civ. No. H–93–1131.

United States District Court, D. Maryland.

Nov. 26, 1993.

Kathleen Gallogly Cox and Venable, Baejter and Howard, Towson, MD, for plaintiffs.

Stephen H. Sachs, Roger W. Yoerges, Tonya L. Brito, Denise Esposito, Wilmer, Cutler & Pickering, Washington, DC, for defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

A former drug user who has contracted AIDS is here suing an insurance company, claiming that delay in the treatment of her

serious medical condition was caused by wrongful acts of defendant committed when it refused to issue a life insurance policy to her. To protect her identity, plaintiff has been permitted to sue in this case as Jane Doe (hereinafter "Jane").[1]

Presently pending is a motion for summary judgment filed by defendant The Prudential Insurance Company of America ("Prudential"). This case arises as the result of the allegedly wrongful failure of Prudential to disclose to the plaintiff herself the results of a blood test which Jane had been required to take as part of an application for life insurance which she submitted to Prudential. That blood test indicated that Jane was infected with the human immunodeficiency virus ("HIV"), and for that reason Prudential rejected Jane's application. Prudential did not at the time disclose the results of Jane's blood test directly to Jane, although it did offer to disclose them to her personal physician. Plaintiffs allege that as a result of Prudential's failure to disclose to Jane the results of her blood test, and as a result of certain statements made to Jane by defendant's agent, Dennis Gnau, she was unaware of her HIV-positive status for some 20 months. According to plaintiffs, the allegedly wrongful acts of defendant and its agent deprived Jane of an early opportunity to obtain appropriate and necessary medical treatment, which would have increased significantly her life expectancy. Substantial compensatory and punitive damages are sought.[2]

Memoranda, exhibits, depositions and other discovery materials in support of and in opposition to the pending motion have been submitted by the parties and reviewed by the Court. Oral argument has been heard in open court. For the reasons to be stated herein, defendant's motion for summary judgment will be granted as to all of the claims asserted by the plaintiffs in this case.

## I

### Facts

The material facts which pertain to the Court's consideration of the pending motion for summary judgment are essentially uncontested.[3] On December 20, 1989, plaintiffs Jane and John Doe met with Dennis Gnau, a local insurance agent of Prudential, in order to update an existing insurance policy maintained by plaintiffs with Prudential. During the course of that meeting, Gnau discussed with plaintiffs other possible insurance needs which plaintiffs might have and suggested that Jane, who was at the time in the last trimester of a pregnancy, should apply for a life insurance policy with Prudential.

With Gnau's assistance, Jane completed an application for life insurance with Prudential. At that time, the Does were informed by Gnau that Jane would be required to submit to a blood test as part of the application process. The Does had no objection to the blood test. Certain information in the application was falsified by Jane. She stated that she had never used cocaine or heroin but later admitted during her deposition that she had used both of these drugs on numerous occasions and had even injected these drugs intravenously.

On January 24, 1990, a representative of GIB Laboratories ("GIB"), a wholly-owned subsidiary of Prudential, visited the Does' home to obtain a blood sample from Jane. At that time, Jane was provided with an informed consent form, which stated that the blood sample taken from her would be "subjected to such testing as deemed necessary or desirable by the requesting insurance company," and that, "[u]nless precluded by law, this may include tests to determine the

---

1. Jane has been joined in this action by her husband, identified as John Doe (hereinafter "John"), who seeks a recovery for loss of consortium.

2. Compensatory damages in the amount of $5 million are sought as well as punitive damages in the amount of $5 million. In addition, plaintiffs jointly seek damages in the amount of $1 million for loss of consortium.

3. Although disputing such allegations, Prudential has accepted as true for purposes of the pending motion the allegations in plaintiffs' amended complaint regarding various statements purportedly made to plaintiffs by defendant's agent, Dennis Gnau.

presence of antibodies or antigens to the Human Immunodeficiency Virus (HIV), also known as the AIDS virus, other blood constituents and certain drugs." Jane read and signed the form, and a blood sample was taken.

Jane's blood sample was processed by GIB and was determined to be HIV-positive. These laboratory results were then telefaxed to Prudential's Medical Director at the time, Dr. Vincent Treat, along with guidelines of GIB for interpreting the results.

Based upon the blood test results, Prudential rejected Jane's application for life insurance. On February 13, 1990, a standard rejection letter was sent to Jane by Thomas Reichley, a Prudential Underwriting Consultant, informing her that, "after having given [her] application very careful consideration," Prudential had concluded that it could not offer Jane a policy. The letter stated that the reason for this decision was "because of the results of [Jane's] blood test." The letter also contained the following statements:

> If you have any questions about our decision, *please let me know.* If you wish, you may receive copies of the information in our files which relate to the decision. The only exception is medical information which, *in some cases may not be given to you directly but may be given to your personal physician.* (emphasis added)

On February 12, 1990, an advance copy of this rejection letter had been sent by electronic mail to Gnau, who, as the local agent handling Jane's application, was to contact the Does before they received the rejection letter by mail. The rejection letter did not indicate, nor was Gnau at any time informed by Prudential, that Jane's blood test results indicated that Jane was HIV-positive. Prudential's failure to include this information was in accordance with Prudential's then-existing policy concerning the disclosure and release of HIV test results to rejected applicants. To avoid the possibility of inadvertent disclosure of highly sensitive and confidential information of this kind, Prudential did not specify or make any other mention of HIV test results in a rejection letter like this one. Moreover, Prudential never revealed such information to local insurance agents. It was

Prudential's preference to release such information, when requested, only to a physician designated by the rejected applicant, so that the physician could then explain to the applicant the significance of the test results and make appropriate recommendations concerning counseling and treatment. Prudential contends that, if an applicant insisted on having the information released directly to him or her and made a written request to that effect, its policy was to release the information directly to the rejected applicant. Plaintiffs dispute this contention.

On February 12, 1990, immediately after having received an advance copy of Jane Doe's rejection letter, Gnau contacted the Does by telephone and relayed to them the information that Jane's application had been rejected because of the results of her blood test. Plaintiffs inquired as to the specifics of the test results, but Gnau advised plaintiffs that he did not have that information. Plaintiffs then requested that the test results be released directly to them, but Gnau advised plaintiffs that Prudential's policy was not to release such information directly to an applicant. Gnau indicated that the test results would be released only to a physician designated by plaintiffs. The Does told Gnau that they did not wish to have the blood test results released to a physician but only to them. Gnau repeated that the results could not be released directly to the Does, but stated that he would be willing to prepare for Jane's signature a letter to Prudential specifically requesting information concerning Prudential's decision to reject Jane's application. Gnau prepared and forwarded such a letter to Jane. It was to be signed by Jane, and it requested an underwriting consultant of Prudential to send her "information you have which related to your decision concerning" the life insurance policy in question. Although provided with a stamped, return envelope addressed to Gnau, Jane never signed and mailed the letter back to Gnau.

During several telephone conversations with Jane, Gnau told her that erroneous rejections were common occurrences and that she should not worry about her blood test because it was probably just "another mistake." Gnau suggested to the Does that the

companies which performed the blood tests for Prudential often got samples mixed up or otherwise produced inaccurate results, and that Jane's blood test results were probably either an error or were related to some transient factor, including possibly Jane's pregnancy. Gnau advised the Does that if Jane would simply wait thirty to sixty days and reapply for another life insurance policy through him, Jane might likely be able to obtain a life insurance policy.

At the time of Prudential's rejection of her application, Jane Doe was approximately eight months pregnant and was not aware that she was HIV-positive. In her deposition, Jane admitted to an extensive history of drug use, including on a number of occasions the intravenous injection of both heroin and cocaine. Nevertheless, she claimed to be in good health when her application was rejected, and she has claimed that she had no idea that her rejection was due to the fact that she was HIV-positive. According to Jane, she believed at the time that her application had been rejected either because of a condition related to her pregnancy or because her blood test had revealed the presence of illegal drugs. She was fearful that if she designated a physician to receive from Prudential the results of her blood test, and if that physician discovered that the results indicated the presence of illicit drugs, then steps might be taken to have Jane's baby taken away. Accordingly, Jane and her husband refused to designate a physician to be advised of the results of her blood test and instead asked Gnau that such results be disclosed directly to them.

On February 23, 1990, Jane Doe gave birth to a child by Caesarean section.[4] Following the birth of her child, Jane remained unaware of her HIV-positive status and thus resumed her normal activities, which included, among other things, having unprotected sexual relations with her husband and nursing her child. She never did reapply for life insurance as suggested by Gnau.

In July 1991, Jane sustained an injury to her wrist, for which she was treated by Dr. John Richard Wells. In the course of that treatment, Jane received a cortisone injection in her wrist on September 19, 1991. As he attempted to recap the hypodermic needle following the injection, Dr. Wells accidentally pricked his own finger with the needle. As a precautionary measure, Dr. Wells later asked Jane to return to his office and submit to an HIV blood test, and Jane was tested on September 23, 1991. When that blood test indicated that Jane might be HIV-positive, Dr. Wells referred Jane to Dr. Mark Abbruzzese, an infectious disease specialist, for consultation and more sophisticated blood testing.

On October 15, 1991, Dr. Abbruzzese confirmed that Jane was HIV-positive.[5] When he spoke with her about his findings, Dr. Abbruzzese asked Jane if she had recently had any blood tests performed. Jane indicated to Dr. Abbruzzese that in February of 1990, Prudential had required her to undergo a blood test as part of her application for life insurance, and that her application had been rejected by Prudential because of the results of that blood test. Dr. Abbruzzese then asked Jane to submit a written authorization to Prudential to release to him the results of the February 1990 blood test. Upon receipt of this request from Jane, Prudential sent the blood test results to Dr. Abbruzzese, and plaintiffs learned for the first time that Jane had been infected with the HIV since at least February of 1990.

When he confirmed that Jane was HIV-positive, Dr. Abbruzzese started Jane on a course of therapy and treatment with the drug AZT. In his deposition, Dr. Abbruzzese has testified that the delay in the initiation of treatment of Jane from February of 1990 to October of 1991 has reduced significantly the efficacy of the AZT drug and has reduced Jane's life expectancy.

Plaintiffs originally filed their complaint in the Circuit Court for Baltimore City. After plaintiffs had filed an amended complaint dropping Gnau as a defendant, Prudential timely removed the case to this Court be-

---

4. Jane's baby was later found to be not infected with the HIV virus.

5. Later, John was also tested and found to be HIV-positive.

cause of the existence of diversity jurisdiction.

## II

### Summary Judgment Principles

It is well settled that a defendant moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; see also Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. Id.

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. See Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " Barwick v. Celotex, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627, 640 (E.D.N.C.1966), aff'd, 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in Bland v. Norfolk and Southern Railroad Company, 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court has had an opportunity to clarify and expand the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In Anderson, the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

Id. at 252, 106 S.Ct. at 2512 (emphasis added).

In Catrett, the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule. Civ. Proc. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Id. at 327, 106 S.Ct. at 2555.

The Fourth Circuit discussed the Supreme Court's holdings in Anderson and Celotex in

*Felty v. Graves–Humphreys Co.*, 818 F.2d 1126 (4th Cir.1987). Quoting *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, Judge Wilkinson in *Felty* emphasized that trial judges have "an affirmative obligation … to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356.

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted.

## III

### *The Claims*

Plaintiffs' amended complaint contains a laundry list of legal theories whereby plaintiffs seek to recover under Maryland law substantial sums from defendant because Jane Doe was not personally informed in February of 1990 that she was HIV positive. The circumstances here are tragic, and one cannot help but feel sympathy for the Does, both of whom are infected with a fatal disease. Their young child is faced with the prospect that both of his parents will soon die of AIDS. Nevertheless, the Court cannot render its decision based on considerations of sympathy. More than an array of imaginative legal theories is needed to withstand the well supported motion for summary judgment filed herein by defendant Prudential. In spite of the extensive discovery undertaken in the case, plaintiffs have not been able to point to material facts in the record which would defeat defendant's right to summary judgment on all of the counts of the amended complaint.

In their amended complaint, plaintiffs assert the following claims: Count I—strict liability; Count II—fraud; Count III—constructive fraud; Count IV—breach of fiduciary relationship; Count V—negligent misrepresentation; Count VI—intentional infliction of emotional distress; Count VII—negligence; Count VIII—loss of consortium.

When the facts contained in this extensive record are considered in the light of applicable summary judgment principles, this Court finds and concludes as a matter of law that plaintiffs are not entitled to a recovery from defendant Prudential under any of the claims asserted.

## IV

### *Discussion*

#### (a)

#### *Count I—Strict Liability*

■ In Count I of the amended complaint, plaintiffs allege that defendant Prudential was strictly liable to them because its refusal to disclose to Jane the results of her blood test "constituted an abnormally dangerous activity which exposed those and others to an unreasonable risk of grave harm." The facts of record here do not indicate that the challenged activity would give rise under Maryland law to a viable claim for damages under a theory of strict liability.

The Court of Appeals of Maryland has ruled that the "abnormally dangerous activity" doctrine necessary for proof of a claim of strict liability has no application to instances in which the alleged tortfeasor is not an owner or occupier of land. *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 133, 497 A.2d 1143 (1985). The thrust of the doctrine is that the challenged activity be abnormally dangerous in relation to the land area in which it occurred. *Id.* Obviously, defendant Prudential cannot under this doctrine be held strictly liable to plaintiffs because of what occurred in this case.

Accordingly, defendant is entitled to the entry of summary judgment as to Count I.

#### (b)

#### *Count II—Fraud*

■ In Count II, plaintiffs seek a recovery based on a theory of fraud. Plaintiffs contend that they relied to their detriment on

certain statements made to them by Gnau, Prudential's agent. According to plaintiffs, these statements were false and were intentionally made by Gnau for the purpose of defrauding the plaintiffs.

In its recent opinion in *Gross v. Sussex, Inc.*, 332 Md. 247, 630 A.2d 1156 (1993), the Court of Appeals of Maryland enumerated the elements of a *prima facie* claim for fraud under Maryland law, as follows:

(1) that a false representation of a material fact was made by defendant;

(2) that the falsity of the statement was known to the defendant, or that the misrepresentation was made with such reckless indifference to the truth as to impute knowledge of its falsity to the defendant;

(3) that the misrepresentation was made for the purpose of defrauding plaintiffs;

(4) that plaintiffs not only acted in reliance on the misrepresentation but had a right to rely upon it with full belief in its truth, and that plaintiffs would not have acted in the same way if the misrepresentation had not been made; and

(5) that plaintiffs suffered some harm as a direct result of the misrepresentation.

The critical distinction between a claim of fraud and a claim of negligent misrepresentation is that fraud requires "scienter on the part of the defendant—intent to deceive the other party." *Martens Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982).

Applying these principles here, this Court concludes as a matter of law that plaintiffs have failed to adduce facts which would support its claim of fraud. There is no evidence that Gnau made the statements in question for the purpose or intent of defrauding the plaintiffs nor that he intended that, based on his statements, they would not request that the results of Jane's blood test be disclosed to Jane's physician. Gnau told the plaintiffs that he did not know the results of Jane's blood test, and he suggested that Jane and her husband name a doctor so that the results could be released to him. The evidence of record does not indicate that Gnau's statements were intended to impede or discourage the Does from obtaining the results of Jane's

blood test. Indeed, Gnau even drafted a letter for Jane to sign so that she might obtain information from Prudential concerning the reasons for her rejection. Gnau's conduct hardly suggests that he purposefully intended to defraud plaintiffs in order to gain a benefit.

Since proof of scienter does not exist in this case, defendant's motion for summary judgment will be granted as to Count II.

(c)

*Count VI—Intentional Infliction of Emotional Distress*

■ For similar reasons, plaintiffs cannot prevail in this case on their claim for the intentional infliction of emotional distress. In *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977), the Maryland Court of Appeals first recognized the common law tort of intentional infliction of emotional distress. As defined by Chief Judge Murphy in *Harris*, the tort has four elements:

(1) the conduct must be intentional or reckless;

(2) the conduct must be extreme and outrageous;

(3) there must be a causal connection between the wrongful conduct and the emotional distress; and

(4) the emotional stress must be severe.

*Harris*, 281 Md. at 566, 380 A.2d 611; *B.N. v. K.K.*, 312 Md. 135, 144, 538 A.2d 1175 (1988).

Proof does not exist in this record to support several of these elements. The conduct of Prudential and its agent has not been shown to be intentional or reckless. Moreover, it was not "outrageous" for Prudential and its agent to offer to reveal to Jane's physician the results of her blood test. The challenged conduct cannot under the circumstances here be characterized as "atrocious" and "utterly intolerable." *See Metz v. United States*, 723 F.Supp. 1133, 1137 (D.Md. 1989).

For these reasons, defendant is entitled to summary judgment as to Count VI of the amended complaint.

### (d)

### *Counts III, IV and VII—*
### *Constructive Fraud, Breach of Fiduciary*
### *Relationship, and Negligence*

■ Count III of the amended complaint seeks a recovery for constructive fraud; Count IV alleges breach of a fiduciary relationship and Count VII seeks damages for negligence. An essential element of each of these claims is proof of the existence of a duty owed by the defendant to the plaintiffs. It is plaintiffs' contention that defendant owed them a duty under Maryland law to disclose to them in February of 1990 the results of Jane's blood test. In seeking summary judgment as to Counts III, IV and VII, defendant Prudential asserts (1) that it owed no duty to plaintiffs to disclose to them the results of Jane's blood test and (2) that even if such a duty existed, Prudential satisfied that duty by offering to make the test results available to a physician designated by Jane.

The parties agree that under Maryland law the existence of the duty in question is an essential element of plaintiffs' negligence claim, of plaintiffs' constructive fraud claim and of plaintiffs' breach of fiduciary duty claim. *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078 (1986); *Gross v. Sussex, Inc., supra; Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 234–35, 469 A.2d 867 (1984). Whether such a duty exists is an issue of law for the court to decide. *Eisel v. Board of Education,* 324 Md. 376, 385, 597 A.2d 447 (1991).

As the Maryland Court of Appeals stated in *Jacques v. First Nat'l Bank,* 307 Md. 527, 515 A.2d 756 (1986), the duty element in a negligence action is merely "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* at 533, 515 A.2d 756 (quoting *Prosser & Keeton on the Law of Torts,* § 53 at 358 (5th ed. 1984)). Among the variables to be considered in determining whether a tort duty should be recognized are the following:

"[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Village of Cross Keys, Inc. v. United States Gypsum Co.,* 315 Md. 741, 752, 556 A.2d 1126 (1989) (quoting *Tarasoff v. Regents of Univ. of Calif.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976)). Of these factors, the most important are the extent and foreseeability of the harm to plaintiffs, *Eisel v. Board of Educ.,* 324 Md. at 386, 597 A.2d 447, and the nature of the relationship that exists between the parties. *Weisman v. Connors,* 312 Md. 428, 446, 540 A.2d 783 (1988).

The parties have cited no Maryland case holding that a duty to disclose exists under circumstances like those present in this case. Moreover, none of the cited decisions of other courts deal with the issue of an insurance company's duty to disclose to an applicant for a policy information of the sort involved here. At least thirteen states have by statute imposed an affirmative duty to disclose an HIV-positive test either (1) directly to the applicant or (2) to a designated physician or a responsible government agent. *See e.g.,* Cal. Ins.Code § 799.03; Fla.Stat. § 627.429. Colorado's insurance code expressly forbids an insurer from disclosing the specific results of an HIV blood test directly to the applicant and mandates that disclosure must always be to a physician designated by the applicant. Colo.Rev.Stat. § 10–3–1104.5(5). The existence of these statutes suggests that in the states involved no common law duty existed requiring an insurance company to disclose to an individual the results of a test of this sort.

No legislation of this sort has been enacted by the Maryland Legislature. Maryland does, however, have legislation imposing significant duties of disclosure and notification on health care providers and on physicians who learn of a person's HIV-positive status through a blood test conducted by the pro-

vider or a physician. *See Maryland Health—General Code,* § 18–333 *et seq.* This statute does not impose such a duty on an insurance company like Prudential.

In claiming that an insurance company has a common law duty of disclosure under the circumstances of this case, plaintiffs rely on language from decisions which have determined that such a duty arises out of the relationship between an examining physician and the person examined. In *Meinze v. Holmes,* 40 Ohio App.3d 143, 532 N.E.2d 170, 173 (1987), the Ohio Court of Appeals held that a physician employed by an insurer who examines an insured and thereby discovers a significant medical condition unknown to the insured has a duty to disclose that condition to the insured. In *Hoover v. Williamson,* 236 Md. 250, 253–54, 203 A.2d 861 (1964), the Maryland Court of Appeals held that a similar duty existed requiring such disclosure by a physician retained by an employer to conduct annual x-ray examinations of employees. *See also Betesh v. United States,* 400 F.Supp. 238 (D.D.C.1974). Plaintiffs argue that the principles of those cases are applicable here because, even though a physician did not perform Jane's blood test, the results of that test were provided to Prudential's medical director for review and appropriate action. According to plaintiffs, defendant Prudential had a duty to disclose the information to Jane as soon as her records were reviewed by Prudential's medical staff.

Following its review of the cases cited, this Court concludes that there is no merit to the arguments advanced by plaintiffs here. The duty to disclose recognized in *Meinze* and *Hoover* arises precisely because a physician had conducted the examination in question, had provided medical judgments or had assumed an advisory role traditionally associated with professional expertise. None of those circumstances is present here. As the Court said in *Meinze:*

This duty arises because the physician has examined the insured personally or has reviewed his confidential records, and *he has thus assumed a professional and expert position with respect to the insured's physical condition and well-being,* even

though a doctor-patient relationship has not been created.

532 N.E.2d at 174 (emphasis added). Similarly, in *Hoover* the Maryland Court of Appeals expressly noted the importance of some affirmative action by a physician on behalf of or towards the person being examined, even in the absence of a formal doctor-patient relationship, as follows:

*It may be assumed that if [the physician] had done no more than direct or supervise the x-ray examination of [plaintiff], his only duty would have been to [the employer].* The allegations . . . [,] however, go further. [The physician] undertook to advise [plaintiff] of his condition of health, referred him to a consultant (expert in the field) and, after this consultation, both affirmatively undertook to advise [plaintiff] again, and . . . concealed from him the recommendation . . . of the consultant. . . . *The allegations amounted to more than that the doctor kept silent after review of the x-ray revelations and the findings of the consultant.*

*Hoover,* 236 Md. at 255, 203 A.2d 861 (emphasis added). *Accord Betesh,* 400 F.Supp. at 247 (noting that government physicians had voluntarily "assum[ed] . . . diagnostic and advisory duties" and had taken "upon themselves the role of treating physicians").

Applying the principles of these cases to the facts of record here, this Court concludes that defendant Prudential owed no duty under Maryland law to disclose to Jane personally the results of the blood test in question. No professional and expert position was assumed by Prudential with respect to Jane's physical condition and well-being when it conducted the blood test in question. Since no such duty was owed by defendant to Jane, plaintiffs' claims of negligence, constructive fraud and breach of fiduciary duty must fail as a matter of law.

Plaintiffs rely on Prudential's own internal policies in arguing that a legal duty of disclosure existed. According to plaintiffs, Gnau violated Prudential's internal policy by erroneously informing the Does that Prudential would disclose Jane's blood test only to a physician and not to Jane. This contention must likewise fail. The Maryland Court of

Appeals has "long held that the custom and practice of a party as distinguished from general custom and practice is inadmissible (as to the issue of negligence) since it is not helpful in a determination of what constitutes reasonable care." *Western Maryland Ry. v. Griffis,* 253 Md. 643, 653, 253 A.2d 889 (1969). Thus, any failure on the part of Gnau to follow Prudential's internal policies is not any evidence of negligence on the part of defendant Prudential. *Western Maryland Ry.,* 253 Md. at 653, 253 A.2d 889; *Honolulu Ltd. v. Cain,* 244 Md. 590, 598, 224 A.2d 433 (1966). Nor under the facts here was there a fiduciary or special relationship between Jane and defendant which would give rise to a duty to disclose. The relationship between Prudential and Jane was not a confidential one of the type recognized by Maryland law. *See Midler v. Shapiro,* 33 Md.App. 264, 268, 364 A.2d 99 (1976).

In any event, even if a duty of the sort claimed by plaintiffs did exist, the facts establish that defendant Prudential satisfied that duty. Defendant was at all times willing to advise Jane's personal physician of the results of the blood test. Indeed, later on request, it did so. However, for reasons which have never been adequately explained, Jane never requested that the information be made available to her physician. Disclosure to her doctor as her agent would certainly satisfy any duty of disclosure imposed on defendant if one were found to exist under Maryland law. *See Meinze,* 532 N.E.2d at 174.[6]

For all these reasons, defendant's motion for summary judgment will be granted as to Counts III, IV and VII of the amended complaint.

(e)

*Count V—Negligent Misrepresentation*

■ In Count V of the amended complaint, plaintiffs have asserted a claim of negligent misrepresentation. This claim is based on statements made to the plaintiffs by Gnau after Jane's application had been rejected by Prudential. Plaintiffs contend that they relied to their detriment on Gnau's

statements that the results of Jane's blood test were transient, were medically insignificant and were perhaps inaccurate. According to plaintiffs, Gnau told them that Jane should merely reapply for a policy, and plaintiffs suggest that Gnau made the statements in question so that he might benefit from future business transactions between the parties.

In *Gross v. Sussex, Inc., supra,* the Court of Appeals of Maryland enumerated the elements of a claim for negligent misrepresentation under Maryland law as follows:

(1) that defendant, owning a duty of care to plaintiffs, negligently asserted a false statement;

(2) that defendant intended that its statement would be acted upon by plaintiffs;

(3) that defendant had knowledge that plaintiffs would probably rely on the statement, which, if erroneous, would cause loss or injury to plaintiffs;

(4) that plaintiffs, justifiably, acted in reliance on the statement; and

(5) that plaintiffs suffered harm proximately caused by defendant's negligence.

On the record here, this Court finds and concludes as a matter of law that plaintiffs could not have acted to their detriment in justifiable reliance on the statements made to them by Gnau. Plaintiffs contend that they did not seek further information concerning the results of Jane's blood test in reliance on what Gnau told them. But plaintiffs focus solely on what Gnau said in several telephone conversations with them. Gnau's statements must be considered in the context of other significant circumstances surrounding the events at issue. Jane received a letter dated February 13, 1990, from Thomas Reichley, an underwriting consultant of Prudential. That letter informed Jane that if she had any questions about Prudential's decision to reject her application because of the results of her blood test, she should "please let me know." She was told that medical information in some cases could not be supplied to her directly but could be given to her person-

---

**6.** In *Meinze,* the Court held, *inter alia,* that the delivery of medical reports to the plaintiff's attor-

ney was the functional equivalent of disclosure to the plaintiff or to his physician.

al physician. Gnau himself, when he spoke to the Does, indicated that he would prepare a formal letter to an underwriting consultant of Prudential specifically requesting the information. This letter was prepared by Gnau and was sent to Jane. For reasons of her own, Jane never signed the letter and never returned it to Gnau or Prudential.

Even more significant insofar as the issue of justifiable reliance is concerned is the Does' history of intravenous drug use and unprotected sex with intravenous drug users and others. The pertinent historical facts and the Does' knowledge of them is discussed in some detail hereinafter. This knowledge on their part placed Jane on notice that she was at risk of being infected with the HIV. Possessed with such knowledge, the Does could not have reasonably relied on Gnau's statements that the blood tests were unimportant and insignificant. They knew that Jane's application had been rejected because of the results of her blood test, which they knew included testing for the HIV. They also knew that Gnau was not aware of the actual results of the test. Moreover, when he made the statements relied upon by plaintiffs, Gnau did not know that the Does had a prior history of intravenous drug use. Indeed, Jane had falsified her application in this regard. Accordingly, the Does were certainly aware of the fact that Gnau did not possess this critical knowledge when he spoke to them on the telephone. On the record here, this Court concludes that a fair minded jury could not find that plaintiffs justifiably relied on the statements made to them by Gnau after Jane's application had been rejected.

For these reasons, summary judgment will be entered in favor of defendant as to Count V.

### (f)

*Contributory Negligence and Causation—*

*All Counts*

■ There is an alternative ground for the granting of defendant's motion for summary judgment. In seeking summary judgment, defendant has also contended that plaintiffs claims are barred by their own contributory negligence. Defendant asserts that plaintiffs' claims of negligence, constructive fraud and breach of fiduciary duty alleged in Counts VII, III and IV of the amended complaint all sound in negligence and that under Maryland law each of these claims are barred as a matter of law because plaintiffs were contributorily negligent. Defendant's argument would likewise pertain to the issue of causation which arises under all eight of the counts of the amended complaint. Plaintiffs have the burden in this case of proving by a preponderance of the evidence not only that defendant committed each of the wrongs alleged, but also that defendant's wrongful acts proximately caused the harm alleged. If acts or omissions of the plaintiffs were the proximate cause of the damages sustained by them, then plaintiffs would not be entitled to go to trial on any of the counts of the amended complaint.

Under Maryland law, the issue of contributory negligence is ordinarily one for the jury to decide. *Wright v. Hixon,* 42 Md.App. 448, 455, 400 A.2d 1138 (1979); *McSlarrow v. Walker,* 56 Md.App. 151, 161, 467 A.2d 196 (1983). Nevertheless, Maryland appellate courts have not hesitated to affirm lower court decisions concluding that contributory negligence existed as a matter of law. *Craig v. Greenbelt Consumer Services,* 244 Md. 95, 222 A.2d 836 (1966); *McManamon v. High's Dairy Products Corp.,* 230 Md. 370, 187 A.2d 318 (1963). On the record here, this Court concludes that this is one of those cases where the minds of reasonable persons could not differ and where the Court is justified in deciding the question of contributory negligence as a matter of law.

One simple act on Jane's part would have avoided any harm which resulted from her failure to know in February of 1990 that she was HIV-positive. A mere phone call or letter to defendant requesting release of the results of her blood test to her physician would have immediately placed her in possession of the necessary information. Whatever irrational thoughts may have motivated Jane to act as she did, it was unreasonable in the extreme for her not to take this simple step.

Jane knew that Prudential's blood test included screening for HIV. She was specifically so informed. She also knew that her

application had been rejected for no reason other than the results of her blood test. Even more significantly, both Jane and her husband were aware that they had engaged in intravenous drug use and had had unprotected sex with intravenous drug users and with others, thus subjecting them to a substantial risk of contracting HIV. Yet, unaccountably, Jane never requested that her physician be told of the results of the blood test. A reasonable person's conduct is to be judged "in the light of all the relevant knowledge which the person actually then had." *Craig,* 244 Md. at 97, 222 A.2d 836.

In 1988 and 1989, Jane injected intravenously both cocaine and heroin on numerous occasions. She shared needles with her husband and other drug users. She knew that sharing needles with other intravenous drug users presented a risk of contracting the HIV. Both Jane and John testified in their depositions that they cleaned intravenous needles with bleach to reduce the risk of infecting themselves with the HIV. Jane had unprotected sexual intercourse with John and other previous partners whom she knew were intravenous drug users. She was well aware of the fact that sexual intercourse of this sort presented a risk and even asked John and one or more of her previous sexual partners, before having sex with them, whether they had the HIV. These facts make it abundantly clear that Jane understood the substantial risks posed by her prior drug use and sexual activity. Yet, when told that her application had been rejected because of a blood test which she knew had included screening for the HIV, she unaccountably did not ask that her physician be advised of the results of the blood test.

In February of 1990, Jane was 8 months pregnant. Certainly, any reasonable person, knowing what Jane did, should have been concerned about the fact that if something was wrong with her blood, her baby may also have been at risk. Jane did not avail herself of any of the steps which would have prompt-

ly given her access to this critical information. She did not respond to Reichley's letter by designating a doctor to whom Prudential would have released the results. She did not sign and return the letter drafted for her signature by Gnau. She did not seek an independent blood test. The very basis for the claim asserted by Jane in this case is that she experienced delay in knowing that she was HIV-positive. Yet, Jane was not willing to have this critical information furnished to her doctor, an act which would have immediately permitted her to start necessary treatment for any illness disclosed. What an ordinarily prudent and careful person would do under a given set of circumstances is usually controlled by the instinctive urge of one to protect oneself from harm. *Menish v. Polinger Company,* 277 Md. 553, 559, 356 A.2d 233 (1976). Thus, in the application of the doctrine of contributory negligence, a critical element is whether or not the plaintiff, chargeable with notice of what a reasonably and ordinarily prudent person would have known and foreseen and chargeable with foreseeing what common experience tells may occur, took proper precautions for her own safety. *Id.* at 562, 356 A.2d 233.

Based on these compelling facts of record, this Court concludes that contributory negligence on the part of Jane has been established as a matter of law. Moreover, the damages claimed in this suit were not as a matter of law caused by any wrong committed by defendant. Plaintiffs' claims asserted in all counts of the amended complaint are accordingly barred either because of Jane's contributory negligence or because defendant's conduct was not the proximate cause of the damages sustained.[7]

## V

### Conclusion

For all the reasons set forth herein, this Court will grant the motion for summary judgment filed by defendant Prudential. An

7. In Count VIII of the amended complaint, plaintiffs jointly seek a recovery for loss of consortium. This claim is a derivative one and is maintainable only upon proof of negligence or other actionable wrong of the defendant. *Deems v. Western Maryland Ry. Co.,* 247 Md. 95, 100,

231 A.2d 514 (1967). Since this Court has concluded that plaintiff Jane cannot prevail under Counts I through VII of the amended complaint, summary judgment in favor of defendant must likewise be entered as to Count VIII.

appropriate Order will be entered by the Court.