[718 NYS2d 340]

Barbara Petrosky, Individually and as Executrix of Frank Petrosky, Deceased, Appellant, v Steven Brasner et al., Respondents.

First Department, January 4, 2001

### APPEARANCES OF COUNSEL

*Steven H. Beldock* of counsel, New City (*James G. Yastion* on the brief; *Birbrower, Montalbano, Condon & Frank, P. C.*, attorneys), for appellant.

*Cary Maynard* of counsel, New York City (*Turner & Owen*, attorneys), for Steven Brasner, respondent.

*Courtney M. Robbins* of counsel, New York City (*Howard P. Klar* on the brief; *Motola Klar Dinowitz & Carfora, L. L. P.*, attorneys), for Fabricant & Fabricant, Inc., respondent.

*Michele Gapinski* of counsel, Jericho (*L. Susan Scelzo Slavin* and *Jimmy M. Santos* on the brief; *Slavin Law Firm, P. C.*, attorneys), for United States Life Insurance Company, respondent.

*Steven C. Rauchberg*, New York City, for Examination Management Services, Inc. and another, respondents.

### OPINION OF THE COURT

LERNER, J.

The instant action is one of first impression in New York. At issue is whether an insurance carrier and its agents have a duty to disclose to a prospective insured medical conditions discovered during a pre-insurance physical examination.

On February 3, 1997, decedent Frank Petrosky filed an application for life insurance with defendant agent Steven Brasner (hereinafter Brasner) of Fabricant & Fabricant (hereinafter Fabricant). On February 11, 1997 technician John Jensen (hereinafter Jensen), an employee of Examination Management Services, Inc. (hereinafter EMSI), drew blood and urine, took a blood pressure reading and performed an electrocardiogram (hereinafter EKG) at the direction of The United States Life Insurance Company (hereinafter U.S. Life) as part of its application process. In the course of performing these tests necessary for U.S. Life's determination as to whether Mr. Petrosky qualified for a life insurance policy, Jensen specifically advised Petrosky that the tests were not for the purpose of treatment or evaluation by Jensen. At U.S. Life's further direction, Jensen forwarded the specimens to an independent laboratory for evaluation, and the EKG tape and questionnaire, filled out during the testing, to U.S. Life for evaluation by their underwriters. Although during the application process, Petrosky had asserted he was a non-smoker, the laboratory results revealed abnormal cholesterol blood levels as well as nicotine in the urine, from which U.S. Life concluded that

Petrosky had materially misrepresented his condition. U.S. Life therefore determined that Petrosky's application would be rejected, but decided to offer him an alternative "tobacco users" policy at a lower face value and shorter term, which alternative was communicated to insurance agent Brasner of the brokerage firm of Fabricant & Fabricant. Although the EKG results were abnormal, this may or may not have been one of the bases on which the original application was denied by U.S. Life. There were phone messages exchanged between Petrosky and Brasner, but there was no communication to Petrosky as to the reason for offering an alternative policy. No premium was paid triggering an effective date of a policy, and no policy was in effect when Mr. Petrosky died.

Frank Petrosky died suddenly on April 11, 1997 from a myocardial infarction, brought on by a cardiac tamponade, after which an autopsy revealed severe and extensive atherosclerotic disease. Plaintiff, Mrs. Barbara Petrosky, was thereafter advised that there was no U.S. Life Insurance coverage in effect for her husband's death.

Mrs. Petrosky brought two lawsuits. The first action against U.S. Life, Brasner and Fabricant alleged breach of contract in failing to timely process the original application or offer an alternative policy. That suit was dismissed as to U.S. Life, although Brasner's and Fabricant's cross motions for summary judgment were denied.

The instant action alleges that defendants were negligent in failing to disclose to decedent the results of his physical examination, namely the EKG results which revealed heart abnormalities. Defendants each moved to dismiss on the ground that they had no duty to obtain and no duty to reveal the results of the EKG. Jensen, EMSI, Brasner and Fabricant contended that they never possessed any knowledge of the test results. The IAS Court agreed, rejecting plaintiff's argument that the defendants' failure to disclose was tantamount to misrepresentation, and refused to extend the duty of care owed by employer to employee to Petrosky's relationship with defendants, whose function it was to determine Petrosky's insurability and perhaps sell an insurance policy. The IAS Court also reasoned that dismissal was warranted, insofar as plaintiff had failed to establish that Petrosky was a third-party beneficiary of the contract between EMSI and U.S. Life, so that therefore no duty was owed to Petrosky.

It is well settled that a duty of reasonable care owed by defendant to a plaintiff is elemental to any recovery in negligence

(*see, e.g.*, *Pulka v Edelman*, 40 NY2d 781, 782; *Palsgraf v Long Is. R. R. Co.*, 248 NY 339, 344). Foreseeability of injury does not determine the existence of duty (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402). Unlike foreseeability and causation, both generally factual issues to be resolved on a case-by-case basis by the fact finder, the duty owed by one member of society to another is a legal issue for the courts (*De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055).

The complaint, alleging that defendants, insurers and their agents, were under a duty to disclose to a prospective insured medical conditions discovered during a pre-insurance physical examination, was properly dismissed since, ordinarily, there is no such duty. Plaintiff acknowledges that no such duty exists and asks the Court to assume the role of the Legislature in creating such an obligation. This is neither our function nor mission. Without the existence of a duty, the action cannot stand.

While liability might have been imposed upon defendants if they had affirmatively misled the prospective insured or foreseeably induced him to forgo otherwise necessary treatment (*see*, *Eiseman v State of New York*, 70 NY2d 175, 187), we perceive no factual basis for such theories in this case. Petrosky was not examined by a physician. He was specifically advised that the tests were administered in the routine course of the application process and not for purposes of treatment. There is no indication that he relied on U.S. Life for anything other than approval for life insurance. Nothing in the nature of Petrosky's relationship with this defendant could give rise to a reasonable reliance on it for health information despite the apparent abnormal EKG, the precise nature of which is not revealed. Indeed, U.S. Life certainly would not have offered an alternative "tobacco users" policy had it known that Petrosky had a life-threatening medical condition. Further, Petrosky could not rely on Jensen or EMSI for health information since the examination was for the sole purpose of aiding U.S. Life in determining Petrosky's insurability.

We note, finally, that contrary to plaintiff's argument, the broad duty of disclosure alleged did not arise by virtue of Insurance Law § 2611 (c), which applies only to the discovery of HIV-related tests. Had the Legislature intended to extend the duty to the within circumstances, it would have expressly done so.

Accordingly, the order of the Supreme Court, New York County (Jane Solomon, J.), entered on or about August 19,

1999, which, *inter alia,* granted defendants' motion and cross motions for summary judgment dismissing the complaint, should be affirmed, without costs.

SAXE, J. (dissenting in part). If an insurance company receives test results indicating that an applicant for an insurance policy has a potentially life-threatening medical condition, the insurer has, in my view, a legal duty to notify the prospective insured of those results. Such a duty could be satisfied with only a minimal effort, and does not impose an onerous burden on the insurance industry. Moreover, imposition of the duty in such circumstances comports with established law (*see, McKinney v Bellevue Hosp.,* 183 AD2d 563). For this reason, I would modify the order on appeal so as to deny the motion insofar as it sought summary judgment dismissing the complaint as against defendant insurance company.

According to plaintiff, the decedent, Frank Petrosky, filed an application for life insurance on February 3, 1997, which his insurance agent, defendant Steven Brasner of the insurance brokerage firm of Fabricant & Fabricant, forwarded to defendant United States Life Insurance Company (U.S. Life). At the direction of U.S. Life, on February 11, 1997 a technician employed by defendant Examination Management Services, Inc. (EMSI), obtained blood and urine samples from Petrosky, took his blood pressure reading and performed an electrocardiogram (EKG) as part of the process by which U.S. Life would determine whether the applicant qualified for the requested life insurance policy. According to EMSI's medical director and the technician conducting the tests, the specimens and results were forwarded to an independent laboratory for evaluation, and the EKG tape and questionnaire, filled out during the testing, were forwarded directly to U.S. Life for evaluation by their underwriters.

Plaintiff asserts that Mr. Petrosky never received a response to his application. U.S. Life asserts that based upon blood and urine testing, it concluded that Mr. Petrosky had misrepresented that he was a non-smoker; consequently, it determined that his application would be rejected, but decided to offer him an alternative "tobacco users" policy at a lower face value and shorter term, which alternative was communicated to Mr. Petrosky's insurance agent, Steven Brasner. For his part, Mr. Brasner states that he received U.S. Life's alternative proposal on April 2, 1997, and that he then contacted Mr. Petrosky on April 7, 1997, and again on April 10, 1997, to explain the insurer's position and discuss his options. He says Mr. Petrosky

said he was unable to meet with Brasner until the following week.

Before any such meeting could occur, on April 11, 1997, Mr. Petrosky died suddenly, from a myocardial infarction, after which an autopsy revealed severe and extensive atherosclerotic disease.

Mr. Petrosky's widow, the executrix of his estate, offers evidence that the EKG taken on February 11, 1997 disclosed abnormalities indicative of heart disease, and that U.S. Life was aware of this. She contends that U.S. Life was negligent in failing to disclose to him the abnormal EKG results, the disclosure of which could have enabled Mr. Petrosky to obtain treatment and avoid the heart attack. U.S. Life asserts that it had no such duty toward Mr. Petrosky, and therefore, as a matter of law, cannot be held negligent.

While a viable cause of action in negligence requires the existence of a duty from defendant to plaintiff, and a breach of that duty (*see, Akins v Glens Falls City School Dist.*, 53 NY2d 325, 333), this Court has held that such a duty exists when a prospective employer learns through a pre-employment physical of a job applicant's potentially life-threatening condition (*see, McKinney v Bellevue Hosp.*, 183 AD2d 563, *supra*). I see no reason to arrive at a different conclusion where a prospective insurer learns of a potentially life-threatening condition through a physical examination of a prospective insured.

U.S. Life would have us apply the holdings of *Doe v Jackson Natl. Life Ins. Co.* (944 F Supp 488 [SD Miss 1995], *affd sub nom. Deramus v Jackson Natl. Life Ins. Co.*, 92 F3d 274) and *Doe v Prudential Ins. Co.* (860 F Supp 243 [D Md 1993]), which concluded that an insurer has no duty to disclose positive HIV test results to the applicant.

The court in *Jackson National* held that "there must be something about the relationship between the parties which would justifiably create an expectation on the part of one party that the other was protecting [him] from the occurrence of a particular risk" (944 F Supp, *supra*, at 492). It distinguished between circumstances involving an insurer and an applicant for insurance, and cases where an employer or prospective employer has been held to owe a duty to convey results of medical exams it requires an employee to take (*id.*, at 494). The court remarked that "an insurance company should [not] bear the same burden of care as a physician, i.e. divulging the results of a medical examination" (*id.*, at 494-495). The court's essential reasoning was that any duty on the part of an

employer to divulge the apparent existence of a dangerous condition was derived from the obligations of the physician, of whom, the court noted, "people have a right to expect a certain degree of care and disclosure on their health and health related matters regardless of whether a doctor/patient relationship exists" (*id.*, at 494). Finally, the court in *Jackson National* emphasized the policy against holding people liable for failing to protect others from harm they did not cause (*id.*, at 495).

Similarly, in *Prudential* (*supra*), the court reasoned that a duty will be imposed upon an insurer to disclose test results only where the physician, acting as the insurer's agent in conducting or reviewing the physical examination, "has * * * assumed a professional and expert position with respect to the insured's physical condition and well-being" (860 F Supp, *supra*, at 252).

However, the rationale for the duty described by this Court in *McKinney v Bellevue Hosp.* (183 AD2d 563, *supra*), to convey abnormal results or findings of medical examinations performed on job applicants, is fundamentally different from that discussed in *Doe v Prudential (supra)* and *Doe v Jackson National (supra)*. While *Jackson National* suggests that cases such as *Dornak v Lafayette Gen. Hosp.* (399 So 2d 168, 170 [La]) and *Daly v United States* (946 F2d 1467) simply extend to hospitals the duty of physicians employed by the hospitals, *McKinney* reflects an entirely different basis for imposition of a duty on employers, apart from the duty of an examining physician.

In *McKinney (supra)*, a pre-employment chest X-ray was interpreted by a physician employed by the prospective employer, Bellevue Hospital, and the physician's report indicated the presence of a mass in the lung. The plaintiff was thereafter hired by the defendant, without ever being informed of the results. The Court remarked,

> "The operative question is whether, having correctly detected a disease, defendants were under a duty to disclose the condition to plaintiff.

> "Our law does not generally impose a duty to make disclosure, requiring some affirmative misrepresentation before imposing liability [citation omitted]. However, as suggested by a leading commentator, 'a failure to disclose the existence of a known danger may be the equivalent of misrepresentation, where it is to be expected that another will

rely upon the appearance of safety' (Prosser, Torts § 33, at 179 [4th ed]). 'The causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of inducement of the plaintiff to act, or to refrain from acting, to his detriment' (Prosser, Torts § 108, at 714 [4th ed]).

"The failure to inform an employee *or prospective employee* that his pre-employment physical has detected a serious medical condition is an act of ordinary negligence within the experience of a trier of fact. That, under the circumstances of this case, the silence of the employer induced reliance by plaintiff on his general good health and resulted in the failure to seek treatment, to his obvious detriment, may be inferred from the pleadings for the purposes of a motion to dismiss the complaint (*Arrington v New York Times Co.*, 55 NY2d 433, 442; *Rovello v Orofino Realty Co.*, 40 NY2d 633, 634). *The tendency of the average person, in similar circumstances, to interpret the employer's silence as an indication of good health is so apparent and the consequence of such reliance so potentially serious that we conclude that the law imposes a duty to disclose upon the employer. In comparison with the harm to be abated, the burden placed upon the employer is slight and promotes the public welfare* (*cf., Green v Walker*, 910 F2d 291, 296 [5th Cir])." (*McKinney v Bellevue Hosp., supra*, 183 AD2d, at 565-566 [emphasis added].)

The foregoing quote demonstrates that the duty discussed by this Court in *McKinney* was not intended as an extension of the responsibilities of the physician hired by the employer, but rather, was based on the recognition that an average job applicant in the plaintiff's position would assume that he would be informed by the employer if any test results indicated the presence of a serious condition warranting further investigation and treatment.

Nothing in the discussion in *McKinney* supports the conclusion reached in *Doe v Prudential* (*supra*), that imposition of a duty is only appropriate where the physical examination was conducted by a physician, thereby "assum[ing] a professional and expert position with respect to the insured's physical condition and well-being" (860 F Supp, *supra*, at 252).

Initially, it is well established that the employer's duty to notify the job applicant of test results is not dependent upon the existence of a physician-patient relationship between the job applicant and the physician interpreting test results; the temporary and limited nature of the physician's assigned task does not result in the elimination of the employer's duty (*see*, *McKinney v Bellevue Hosp.*, *supra*; *Meinze v Holmes*, 40 Ohio App 3d 143, 147, 532 NE2d 170, 173-174 ["(t)he duty to disclose will arise under circumstances when a reasonable physician * * * would disclose a significant risk or danger to the person being examined"]).

By the same token, it should make no difference if the professional who read or interpreted Mr. Petrosky's test results was some other type of medical professional. First of all, physicians are not the only professionals who, even when serving on a limited, consulting basis, may still have an obligation to disclose a serious problem that becomes apparent in the course of the consultation (*see*, *e.g.*, *Togstad v Vesely, Otto, Miller & Keefe*, 291 NW2d 686 [Minn] [attorney must notify potential client of imminent expiration of limitations period]). Moreover, a rule limiting the duty of notification to circumstances when a physician conducted the test or interpreted the test results would permit an insurance company to avoid liability simply by employing non-physician technicians to evaluate and interpret the results of medical tests. Such a possibility cannot be countenanced. If an insurer in possession of troubling test results may be said to have a duty to disclose those test results if they were obtained by a physician, there should be no different result where some other form of medical professional or technician obtained them.

The important point is that defendant was allegedly in possession of information of critical importance to decedent. As in *McKinney*, the critical factor is not who interpreted the test results, but that the applicant would naturally believe, in the absence of any notification of a serious problem, that the silence following the physical examination meant that no indication of a critical health problem had been discerned.

There is no justification for ignoring the reasoning of the *McKinney* case in the present circumstances. No valid distinction can be made between a prospective employer and a prospective insurer who know of test results indicating the presence of a potentially life-threatening medical condition in an application, whether it be for a job or for an insurance policy. Nor does the absence of a special relationship between the par-

ties make any difference; even if a special relationship can be said to exist between an employer and an employee, the *McKinney* case applied its reasoning to both employees and prospective employees, and no special relationship can be said to exist between a prospective employer and a mere job applicant.

It cannot properly be concluded as a matter of law that Mr. Petrosky did not rely upon the absence of a report of poor test results to forgo necessary and appropriate medical attention. Rather, an issue of fact is presented as to whether he relied upon the silence following the tests to conclude that nothing was amiss.

Moreover, I reject defendant's suggestion that it must be inferred from Insurance Law § 2611 (c) that the Legislature intended that no duty be imposed upon insurers to disclose test results of any kind of test result other than HIV tests. While the duty statutorily imposed upon insurance companies by Insurance Law § 2611 (c) only applies to the results of HIV-related tests, there is no reason to infer from this that the Legislature purposely decided that no duty must be imposed upon insurers to disclose any other type of test result. Rather, in enacting that provision, the Legislature was merely focusing its attention on the ongoing effort toward preventing the spread of a contagious, deadly illness, which effort requires large-scale, society-wide actions. It did not preclude the courts from imposing a similar duty in other types of circumstances.

Like legislation, the common law has historically developed and grown in response to changes in society (*see generally*, Holmes, The Common Law, at 1-2 [Dover ed]; Cardozo, Nature of the Judicial Process, at 24-28 [Yale Univ Press]). Part of the task of a court operating within the common-law tradition is to determine the propriety of imposing a duty upon a party in a particular situation. In doing so here, the Court would not be preempting the Legislature; rather, it would simply continue the common-law tradition of speaking on a subject on which the Legislature has not spoken (*see*, Cardozo, *supra*, at 19).

The reasoning enunciated in *McKinney* is no less applicable in the present case. Because the average person, in circumstances like Mr. Petrosky's, would tend to interpret the insurer's silence as an indication that no serious medical conditions were apparent in the test results it received, the law should impose upon the insurer a duty to disclose such results. "In comparison with the harm to be abated, the burden placed upon the employer is slight and promotes the public welfare" (*supra*, at 566).

ROSENBERGER, J. P., WILLIAMS and BUCKLEY, JJ., concur with LERNER, J.; SAXE, J., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered on or about August 19, 1999, affirmed, without costs.