784 A.2d 81 (2001)
345 N.J. Super. 142
Maria NOLAN, as Executrix of the Estate of Guy Nolan, and Maria Nolan, individually, Plaintiffs-Appellants,
v.
FIRST COLONY LIFE INSURANCE COMPANY, Defendant-Respondent,
Portamedic Services, Inc., Domenic Schiraldi, D.P.M., Clara Maass Medical Center and Eduardo Monteagudo, M.D., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 2001.
Decided November 13, 2001.
*82 William Levinson argued the cause for appellant (Eichen, Levinson, Cahn & Parra, attorneys; Mr. Levinson, on the brief).
George J. Kenny of Connell Foley, Roseland, argued the cause for respondent (Connell Foley, and Blank Rome Comisky & McCauley, attorneys, Wilmington, DE; Mr. Kenny and Jonathan M. Korn of Blank Rome Comisky & McCauley, on the brief).
Before Judges PETRELLA, KESTIN and ALLEY.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This is an appeal by plaintiffs Maria Nolan, as Executrix of the Estate of Guy Nolan, and Maria Nolan, individually, from summary judgment in favor of First Colony Life Insurance Company (First Colony) and dismissal of the second amended complaint sounding in negligence, and originally malpractice.
In connection with his application for a $200,000 life insurance policy from First Colony, Guy Nolan underwent a pre-insurance *83 screening and blood and urine test by Portamedic Services, Inc. (Portamedic), an agency designated by First Colony. Nolan was subsequently diagnosed with and died of liver cancer two years later. Plaintiff[1] claims that First Colony violated its duty to the decedent by failing to disclose the results of a blood test, which indicated elevated levels of two liver enzymes. The issue on appeal is whether New Jersey case law requires an insurance company to disclose the results of blood test results above the "normal ranges" to the applicant for insurance.[2] Plaintiff also contends that the denial of First Colony's F.R.C.P. 12(b)(6) motion by the federal district court, where the case was initially heard, has res judicata effect, precluding First Colony from denying its duty to disclose the blood test results.
Plaintiff filed a complaint against First Colony, a John Doe, an unknown paramedic, and a James Doe, M.D., an unknown physician, on November 13, 1998. The case was removed to the federal district court for the District of New Jersey based on diversity of citizenship jurisdiction. Defendants moved to dismiss the complaint pursuant to F.R.C.P. 12(b)(6). In denying the motion, the judge examined New Jersey case law and concluded that the physician and the paramedic (factually it developed that no physician or paramedic was involved) may have had a duty of care to the decedent and that a patient-physician relationship could arise based on the alleged factual contentions of the complaint.
Plaintiff amended her complaint to include defendants Domenic Schiraldi (Schiraldi) and Portamedic, thus vitiating federal diversity jurisdiction. The case was remanded to the Superior Court and plaintiff again amended the complaint to add as defendants Clara Maass Medical Center and Eduardo Monteagudo, M.D.[3]
Both sides moved for summary judgment. The judge granted summary judgment in favor of First Colony, Schiraldi and Portamedic, and denied plaintiff's motion. In so ruling, the judge found that First Colony was not vicariously liable for medical malpractice because no medical doctor examined the decedent; First Colony did not have a duty to disclose the test results to the decedent; and the New Jersey Legislature never imposed such a duty.
Plaintiff's motion for leave to appeal was granted as to the dismissal of the complaint against First Colony. Leave to appeal the dismissal of the complaints against Schiraldi and Portamedic was denied. On January 23, 2001, our Supreme Court decided Reed v. Bojarski, 166 N.J. 89, 764 A.2d 433 (2001), and we remanded for reconsideration in light of Reed. The motion judge concluded that Reed did not apply and reaffirmed summary judgment in favor of First Colony. Plaintiff again sought and was granted leave to appeal. We now affirm.
In October 1996, Guy Nolan, born on May 19, 1961, applied for a $200,000 life insurance policy through First Colony. Part of the application process required *84 Nolan to undergo a physical examination. The examination was administered by defendant Portamedic, a company not affiliated with First Colony, on November 11, 1996.[4] Portamedic's business involved performing such examinations for insurance companies. Portamedic's employee Schiraldi conducted the examination. Though Schiraldi graduated from podiatric school, he was not a licensed medical doctor. The examination involved having the decedent complete a questionnaire,[5] taking measurements of height, weight, blood pressure, heart rate and pulse, and taking blood and urine samples.
The blood sample was sent to an independent laboratory and the results, without medical analysis or conclusions, were sent to First Colony. No medical doctor ever looked at the findings of the lab prior to the issuance of the insurance policy. The report indicated the decedent had low cholesterol and normal GGTP levels, but that his SGOT, SGPT and triglyceride levels were above normal. The SGOT and the SGPT levels were approximately 1.1 and 1.3 times the normal range, respectively.[6]
Mary Dellinger had been employed by First Colony for eight years, and was the underwriter who screened decedent's application. She had no medical training, but reviewed the laboratory report and compared the raw data to First Colony's underwriting manual. She gave the elevated levels a rating of zero. The file indicated that this would not result in an adverse underwriting decision.[7] Dellinger approved the application and First Colony issued the decedent a "Preferred" policy around December 1, 1996. First Colony also had a "Best Preferred," a "Standard" policy and rated policies. Nolan was not issued a "Best Preferred" policy because Dellinger marked off "medical reasons."[8]
*85 About two years later, in mid-1998, Guy Nolan was diagnosed with metastatic adenocarcinoma of the liver. About October 8, 1998, Nolan requested and received a copy of the blood test result conducted in association with his life insurance application. Apparently, blood test results from a 1993 hospitalization for surgery were also requested and received. Despite treatment of his condition, Nolan died on November 10, 1998. First Colony paid the full proceeds of the $200,000 policy to the plaintiff, the policy's beneficiary.

I.
In considering the grant of summary judgment we apply the same standard of review as the trial court. Pinkowski v. Township of Montclair, 299 N.J.Super. 557, 566, 691 A.2d 837 (App.Div.1997). Summary judgment should not be granted where there is a genuine issue of material fact. Brill v. Guardian Life Insurance Company of America, 142 N.J. 520, 541, 666 A.2d 146 (1995).
Plaintiff contends that insurance companies should be obligated, under New Jersey law, to disclose to clients the results of blood tests done in order to determine the rating for the insurance, when such tests show an "abnormal" result or reveal a life threatening illness. In support of this contention, plaintiff relies on Reed v. Bojarski, supra (166 N.J. 89, 764 A.2d 433).
Reed was decided after the trial court granted summary judgment for the defendants in December 2000. It dealt with the obligation of a physician to disclose to a patient a potentially life threatening illness discovered in the course of a pre-employment physical examination. Reed, supra (166 N.J. at 91, 764 A.2d 433). The employer contracted with an outside medical group to conduct the tests. Dr. Bojarski performed the examination and during the examination took an X-ray of Reed's chest which was considered abnormal and revealed a widened mediastinum, which "among men in their twenties ... may be an indicator of lymphoma, including Hodgkin's disease," and an unusually large heart. Id. at 92, 764 A.2d 433. However, Dr. Bojarski did not mention the widened mediastinum in his comments about the X-ray, which he described as normal. Six months later, after an X-ray revealed a large mass in his mediastinum, Reed was diagnosed with Stage IIB Hodgkin's disease. Id. at 92-93, 764 A.2d 433.
After examining New Jersey case law, the Reed Court concluded that when a doctor examines a patient for a pre-employment physical, a limited physician-patient relationship is created, resulting in a duty to perform a reasonable and competent examination. Id. at 105, 764 A.2d 433. This obligation was held to include the requirement that a physician make potentially life threatening conditions known to the patient. Id. at 105-106, 764 A.2d 433 (quoting Ranier v. Frieman, 294 N.J.Super. 182, 191, 682 A.2d 1220 (App.Div. 1996)). In so holding, Reed announced that a patient is entitled to rely on the physician to reveal any serious medical condition. Id. at 106, 764 A.2d 433.
The case before us is clearly distinguishable, and the motion judge correctly so ruled. First, Reed dealt with the obligations of physicians. No physician examined Nolan for First Colony and no doctor ever reviewed the laboratory findings. The individual who conducted the pre-insurance examination, including the drawing of blood, was not a physician. In his deposition, he stated that he did not introduce himself to the decedent as "Doctor," but merely gave his first and last name. The laboratory conducted the tests, and the results were forwarded to First Colony without comment. The only person at *86 First Colony to review the results was Dellinger, the underwriter whose function was not to evaluate Nolan's physical condition, but to determine his eligibility for life insurance and determine the type of policy to issue. The motion judge noted that she had no medical training or expertise and merely followed the manual.
Another factual difference between the present case and Reed is that the examination revealed no abnormalities under the standards applied. There were two slightly elevated liver enzyme levels, but other enzyme levels and liver function tests were within normal range. After examining the decedent's test results, Dellinger gave him a risk rating of zero, indicating he was a good candidate for insurance. She then approved issuance of a "Preferred" policy, declining to issue Nolan a "Best Preferred" policy. It seems improbable that First Colony would have issued even a "Preferred" policy if a life threatening or serious condition or disease was noted or found present.
The plaintiff would have the rule of Reed apply to insurance companies, even where no medical personal reviewed the results of the pre-insurance physical reports. Plaintiff relies on Reed's statement of a non-delegable duty to disclose the results of pre-employment physical examinations. Reed, supra (166 N.J. at 96, 764 A.2d 433). However, Reed was clear that this was a non-delegable duty of physicians based on the trust a patient places in the doctor.
Although the pre-employment physical clearly does not establish a traditional physician-patient relationship, that is of no moment. The exact nature of the relationship is simply a factor to be considered in determining what duty exists. What is crucial is that a relationship is created in which a physician is expected to exercise reasonable care commensurate with his expertise and training, both in conducting the examination and in communicating the results to the examinee.

[Id. at 106, 764 A.2d 433.]
Thus, despite the argument to the contrary, as we view it, Reed was based on the duty of physicians and does not now extend to insurance companies where there is neither a physician who finds a life threatening condition nor an indication of a life threatening condition in the information received. Clearly in this commercial setting there is no similar trust or reliance by a patient in the seller of an insurance product as to medical condition.
Moreover, Reed did not change New Jersey law. Reed relied on prior holdings to reach the conclusion that physicians have a duty to disclose test results. In Beadling v. Sirotta, 41 N.J. 555, 561, 197 A.2d 857 (1964), the Court articulated the duty of a physician to act with reasonable care when examining a patient in the context of a pre-employment physical examination. Beadling was followed by Ranier v. Frieman, supra (294 N.J.Super. 182, 682 A.2d 1220), where we affirmed the duty of doctors to disclose results in non-traditional physician-patient relationships based on traditional notions of negligence. Id. at 188, 682 A.2d 1220. The motion judge in the instant case analyzed these cases and properly found that they did not apply to insurance companies. Simply stated, Reed merely restated the law as to physicians and added little new to the analysis. See also McIntosh v. Milano, 168 N.J.Super. 466, 489, 403 A.2d 500 (Law Div.1979) (duty of psychiatrist to warn of death threat to victim by patient in course of therapy).
It is true that in Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 196, 638 A.2d 1288 (1994), the Court stated that in deciding whether to impose a duty, there must be "foreseeability and *87 fairness." However, no duty is imposed on First Colony in the present case because under the circumstances it was not foreseeable that the decedent would expect a medical diagnosis on a pre-insurance physical examination where he was not even turned down for insurance. An individual might well expect medical advise from a professional health care provider. Petrosky v. Brasner, 279 A.D.2d 75, 718 N.Y.S.2d 340, 343 (1st Dept.), leave to appeal denied, 96 N.Y.2d 711, 727 N.Y.S.2d 697, 751 N.E.2d 945 (2001).
Plaintiff cites no authority establishing an insurance company's duty to provide blood test results in the absence of a request. Other jurisdictions have declined to create such a duty. For example, in Petrosky, an insurance company ordered a physical examination preliminary to issuing an insurance policy. Id. at 342. The insurance company offered the decedent a special tobacco-user's policy. However, it did not reveal the results of an electrocardiogram, which indicated the applicant had a heart condition. The decedent died from a heart attack two months after the test was conducted. Ibid. The New York court affirmed the dismissal of the plaintiff's case on the ground that the decedent could not have relied on the insurance company to give a medical diagnosis, but could only have expected an insurance policy. The court observed that the Legislature could create such a duty. Id. at 343. We agree. Any such change is best left to the Legislature, which is traditionally the policy making branch of government.
The New Jersey Legislature has imposed a limited duty on insurance companies to make certain prescribed disclosures. Under N.J.S.A. 17:23A-13.1, an insurance company is obligated to disclose any communicable diseases discovered during an examination due to the obvious public health risks involved. The Legislature did not mandate an absolute duty to make disclosures in other circumstances. It is not the function of a court to expand legislation as a court might think more desirable.
Hence, the motion judge correctly concluded that the case did not alter New Jersey law that no duty exists requiring insurance companies to disclose all pre-insurance examination results or even blood test results outside the "normal range" to potential insured parties.

II.
The plaintiff argues that the federal district court's denial of First Colony's F.R.C.P. 12(b)(6) motion, similar to a R. 4:6-2(e) motion, should be given a res judicata effect on the litigation to prevent First Colony from relitigating the issue of its liability.
Res judicata is a doctrine that declares that once a matter has been fully litigated and resolved, it cannot be relitigated. Lubliner v. Board of Alcoholic Beverage Control, 33 N.J. 428, 435, 165 A.2d 163 (1960). In order for res judicata to have effect, there must be a valid, final judgment on the merits in the prior action; the parties in the second action must be identical to, or in privity with those in the first action; and the claim in the later action must arise out of the same transaction or occurrence as the claim in the first action. Watkins v. Resorts International Hotel and Casino, Inc., 124 N.J. 398, 412, 591 A.2d 592 (1991).
Plaintiff relies on Velasquez v. Franz, 123 N.J. 498, 589 A.2d 143 (1991), which held that the grant of an F.R.C.P. 12(b)(6) motion in the federal court bars subsequent litigation in the state court system. In Velasquez, the plaintiff lost part of his right hand while operating machinery. He brought claims in the United States District *88 Court for the District of New Jersey on diversity of citizenship jurisdiction. The defendants moved under 12(b)(6) to dismiss plaintiff's cause of action for failing to state a claim. The court granted the defendants' motion. Id. at 501-502, 589 A.2d 143. The plaintiff did not appeal the dismissal, but instead filed a virtually identical claim in the Superior Court, Law Division. Defendants again moved to dismiss, relying also on res judicata as a bar to the complaint. The Law Division dismissed the complaint and we affirmed. The Supreme Court likewise affirmed the dismissal of plaintiff's complaint, reasoning that under federal procedural law a dismissal based on 12(b)(6) is an adjudication on the merits. Unless the judge specifies that the complaint is dismissed without prejudice, a 12(b)(6) motion has res judicata effect on the cause of action. Id. at 507-508, 589 A.2d 143.
In the instant case, the plaintiff argues that denial of First Colony's 12(b)(6) motion should have the same preclusive effect against it as would apply if the motion had been granted, as in Velasquez. However, a 12(b)(6) motion is decided on the pleadings alone, and assumes the existence of the facts alleged in the complaint. The federal judge merely said that if certain of the facts alleged could be proven then it may be possible for First Colony to be found liable. The subsequent development of the factual record demonstrates that the federal case did not decide the law of the case, but merely allowed plaintiffs to proceed with their claim.
The federal judge relied on the allegations in plaintiff's complaint that a physician, James Doe, M.D., had conducted the examination and reviewed the results, and that a paramedic, John Doe, obtained the blood sample. As noted above, it was later established that Schiraldi, a graduate of a podiatry school, but not a licensed physician, conducted the examination and drew the blood. Plaintiff's theory was that the alleged unknown, but in reality non-existent physician and paramedic, breached a duty to the decedent. If First Colony was liable, it would be through the actions of its agents. The stated basis of the federal judge's holding turned on the involvement of a physician when he said:
Thus, this case presents the issue of the scope of the duty a physician retained by an insurance company owes to someone who is sent to this physician by the insurance company for a pre-insurance examination. More generally, the issue is the scope of a physician's duty in the absence of a traditional physician-patient relationship. This case requires the Court to predict what the New Jersey Supreme Court would do in an area where the law is unclear.
The federal court judge relied on Beadling, supra (41 N.J. 555, 197 A.2d 857), to attempt to predict that the New Jersey Supreme Court would impose a duty on an unknown doctor, and possibly an unknown paramedic, to have acted reasonably in the pre-insurance examination. The judge concluded by stating that the only way to hold First Colony liable would be through the breach of duty of the physician and perhaps the paramedic. The judge recognized that First Colony had no direct knowledge of any life threatening condition because a policy was in fact issued.
In sum, unlike Velasquez, denial of the 12(b)(6) motion here does not have res judicata effect because no final judgment was entered. After looking at the pleadings alone, the judge merely decided that at that posture a sufficient claim had been stated to allow the case to proceed to discovery. No final judgment was ever entered in the federal case because it was returned to the Superior Court when diversity of citizenship was destroyed by *89 plaintiff's addition of defendants Schiraldi and Portamedic. Subsequent discovery disclosed that the factual basis of the pleadings, and thus the underpinning of the 12(b)(6) motion denial, was erroneous. Therefore, the denial of the 12(b)(6) motion neither established First Colony's liability nor had a preclusive effect.

III.
At the argument on April 12, 2001, after the initial remand by this court, plaintiff attempted to present a cryptic one page certification of a Dr. Bell which only stated that there was a "reasonable degree of medical probability" that the blood test revealed "a potentially life threatening condition" warranting further evaluation. Dr. Bell referred to no facts or basis for his conclusory statement. The motion judge refused to consider it.
We agree with First Colony that the motion judge properly declined to consider Dr. Bell's certification. There was no mistaken exercise of discretion by the motion judge in refusing to consider the certification because it was little more than a net opinion unsupported by any factual predicates or explanation.
Affirmed.
KESTIN, J.A.D. (concurring)
While I concur in the result my colleagues have reached, I respectfully disagree with their view that an insurance company has no duty to disclose abnormal blood test results to a policy applicant. We seem to have different understandings of the meaning of Reed v. Bojarski, 166 N.J. 89, 764 A.2d 433 (2001). I take the Supreme Court's language quoted by my colleagues as a conclusion flowing from a general principle, not a statement of the principle itself. In the quoted passage, the Court undeniably determined that, in the circumstances presented, no traditional physician-patient relationship existed, but it also stated that the existence of that relationship was of "no moment" because "[t]he exact nature of the relationship is simply a factor to be considered in determining what duty exists." Id. at 106, 764 A.2d 433. The full meaning of that declaration can be understood only in the light of the preceding paragraph:
As we have often said, "`whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.'" Kelly v. Gwinnell, 96 N.J. 538, 544, 476 A.2d 1219 (1984) (quoting Goldberg v. Housing Auth., 38 N.J. 578, 583, 186 A.2d 291 (1962)). A duty is said to arise out of the existence of a relationship between the "parties such that social policy justifies" its imposition. W. Page Keeton et al., Prosser & Keeton on the Law of Torts, § 56, at 374 (5th ed.1984).

[Ibid.]
Clearly, the Supreme Court continues to be of the view that tort duties arise from the qualities of a relationship not the status of the parties.
I disagree also that resolution of the question at issue should be left to the Legislature. In the common law, the development of tort jurisprudence has always been a judicial function subject, of course, to legislative oversight. See Thomas v. Romeis, 234 N.J.Super. 364, 370-72, 560 A.2d 1267 (App.Div.1989) (stressing the courts' role in defining the limits of tort liability and quoting from Kelly v. Gwinnell, 96 N.J. 538, 547, 476 A.2d 1219 (1984) that "the duty involved is a common law duty, not one arising from ... statute and regulation"); Ritchie-Gamester v. City of Berkley, 461 Mich. 73, 597 N.W.2d 517, 523 (1999) (noting that in the absence of *90 legislative action, "the development of [the common law of torts] is up to the courts"); Saunders v. Alford, 607 So.2d 1214, 1219 (Miss.1992) (stating "[t]he common law is not static" and rejecting the argument that abolition of a common law tort can only be accomplished by the legislature); Russo v. Sutton, 310 S.C. 200, 422 S.E.2d 750, 753 (S.C.1992) (same). The Supreme Court does not shrink from that role, and neither should we.
In order to reach a sensible result in this case, it is not necessary to depart from the general rule that no tort duty exists requiring every person who becomes aware of a danger to another to take steps to warn the person at risk of the existence of the threat. See Restatement (Second) of Torts, § 314 (1965 and pertinent appendices); 2 Dan B. Dobbs, The Law of Torts, § 314 (2001); see also Praet v. Borough of Sayreville, 218 N.J.Super. 218, 223-24, 527 A.2d 486 (App.Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987). Here, we are not dealing with general duties, but rather with those arising from a special relationship, see generally Restatement (Second) of Torts, § 314A (1965 and pertinent appendices); see also Safer v. Estate of Pack, 291 N.J.Super. 619, 625-26, 677 A.2d 1188 (App.Div.), certif. denied, 146 N.J. 568, 683 A.2d 1163 (1996); cf. McIntosh v. Milano, 168 N.J.Super. 466, 483-84, 403 A.2d 500 (Law Div.1979) (citing Restatement (Second) of Torts, §§ 314, 314A, 315 (1965)), which came to exist when plaintiff's decedent applied for life insurance and defendant carrier undertook to process that application. It may well be untenable, as a general matter, to hold an insurance carrier in such circumstances to a duty beyond simple disclosure of a discovered potential threat to life or health, but requiring only that step hardly seems onerous. The duty of disclosure could be fully discharged by the simple expedient of sending all blood test results to all policy applicants with a form letter suggesting that they should consult their physicians regarding any readings outside of normal ranges.
I concur rather than dissent, however, because of plaintiff's failure to make an adequate prima facie showing on summary judgment befitting the nature of this case. Plaintiff's claim, at bottom, is one for increased risk of harm, see, e.g., Scafidi v. Seiler, 119 N.J. 93, 101-09, 574 A.2d 398 (1990); Evers v. Dollinger, 95 N.J. 399, 412-17, 471 A.2d 405 (1984), occasioned by defendant's failure to disclose information which plaintiff contends raised some question about her decedent's health. Although the concept of increased risk of harm has developed primarily in the context of medical malpractice claims, there is no logical reason why it should not also be applied where other types of special relationship exist. See, e.g., Snyder v. American Ass'n of Blood Banks, 144 N.J. 269, 292-98, 676 A.2d 1036 (1996); Restatement (Second) of Torts, § 323 (1965 and pertinent appendices). Nevertheless, this plaintiff has made no adequate showing that the information which defendant failed to disseminate signified so patent a deviation from good-health norms that it would likely have led her decedent to consult a physician and that, in turn, the physician would likely have been led to take diagnostic steps that would probably have resulted in discovery of the condition that, if promptly treated, would have forestalled or prevented the decedent's death. I agree with the majority that Dr. Bell's certification was properly excluded as net opinion. It was clearly inadequate to satisfy the prima facie showing plaintiff was required to make to defeat defendant's motion for summary judgment. The fact that the policy issued to plaintiff's decedent was a level lower than "best preferred" for "medical reasons," i.e., the *91 slightly "elevated LFT's" indicated, is no surrogate for plaintiff's responsibility to make an adequate prima facie showing.
NOTES
[1] Although we recognize that Maria Nolan sues in both a representative and individual capacity, for simplicity we refer to plaintiffs in the singular hereinafter.
[2] Nolan's cholesterol level was reported as "low." As to the deviation and significance of such ranges see Merck Manual, p. 1374 (Home ed.1997).
[3] These defendants were involved in decedent's medical treatment in 1994, but are not involved as respondents in this appeal. The complaint, as amended, alleged that decedent's prior medical records revealed "abnormal blood test results which were not disclosed to plaintiff's decedent."
[4] The blood chemistry report indicated that Nolan last had a meal at 9:11 a.m. on November 11, 1996, and the specimen was collected at 5:22 p.m. that date. The report also indicated: "Date Recd: 96/11/16 Date Rptd: 11/14/96" and "Serum: Normal."
[5] In his application Nolan answered in the affirmative question 1 on a medical history questionnaire which asked if he had "a regular care provider or treatment facility" and listed his doctor's name and address. He also checked "yes" in response to question 3f which asked if he had been treated for "hepatitis, internal bleeding, ulcer, colitis, diverticula, or disorder of the stomach, esophagus, liver, pancreas, spleen, intestines, colon, rectum, or anus." He specifically wrote what appears to be "Cholecystectomy" in 1993 at Clara Maass Memorial Center. See note 2 supra. He also noted under a family history section that his father died of kidney failure at age sixty-two.
[6] The underwriting guidelines identified the normal range for SGOT (AST) (glutamic oxaloacetic transaminase) as 0 U/L to 41 U/L (usually measured in Karmen units per liter). Nolan's reading was a 45. This was 1.098 times the maximum in the normal range, which can also be expressed as 9.8% above the normal range. The normal range for SGPT (ALT) was 0 to 45 and Nolan tested as 58. This was 1.289 times the maximum in the normal range, or it can be expressed as 28.9% above the normal range. GGT (GGTP) results showed 51 U/L with the normal range being 0 to 65 U/L. Alkaline Phosphatase was within the normal range.
[7] The underwriting guidelines stated that heightened liver enzyme levels could indicate alcohol abuse or special medical conditions, such as diabetes. Dellinger concluded from the questionnaire that decedent did not have either condition. Having reached that conclusion, the manual directed that if the GGTP levels were normal and the SGOT and/or SGPT levels were normal or less than two times above normal, there should be a risk rating of zero.
[8] A note in First Colony's file stated: "CASE APPROVED PREF NS COLLO 200k-NOT BEST DUE TO ELEVATED LFT'S."