**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1748-23
            A-1773-23

I.L.,

     Plaintiff-Respondent,

v.

S.A.,

     Defendant-Appellant.

_____

S.A.,

     Plaintiff-Appellant,

v.

I.L.,

     Defendant-Respondent.

_____

Argued March 27, 2025 – Decided April 8, 2025

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket Nos. FV-18-0125-24 and FV-18-0129-24.

Eric J. Warner (Law Office of Eric J. Warner, LLC) argued the cause for appellant.

Hisham I. Masri argued the cause for respondent (Reddin Masri, LLC, attorneys; Hisham I. Masri, of counsel and on the brief).

PER CURIAM

In A-1748-23, defendant S.A.[1] appeals from a November 16, 2023 final restraining order (FRO) entered against him in favor of plaintiff I.L., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. In A-1773-23, S.A. appeals from the dismissal of his domestic violence complaint seeking an FRO against I.L. S.A. also challenges a January 30, 2024 order denying his motion for reconsideration of the November 2023 order and a February 5, 2024 order granting I.L. counsel fees. We have consolidated these appeals for purposes of issuing one opinion and affirm.

This matter was tried over the course of seven days during which I.L. adduced testimony from herself and her mother. S.A. also testified and called I.L.'s former sister-in-law and an acquaintance S.A. claimed observed one of the

---

[1] We use initials pursuant to Rule 1:38-3(d)(9) and (10).

predicate acts of domestic violence in I.L.'s complaint. The parties admitted over sixty exhibits into evidence, including but not limited to: lengthy emails and text messages between them and others; police reports; prior court orders; photographs; and video and audio recordings.

By way of background, the parties were married in 2012 and divorced in 2019. One child was born of the marriage, who was two years old at the time of the divorce.

During their divorce proceedings, the parties entered a November 1, 2018 consent judgment for custody and parenting time, awarding them joint legal and physical custody of their child. The consent judgment was entered on the same day as a consent order with civil restraints. The consent order memorialized I.L. had previously obtained a temporary restraining order (TRO) against S.A. that she was dismissing the same day. Relevant to the issues raised here, the consent order stated: "The parties shall be restrained and enjoined from making or causing any other person to make harassing communications to each other. Neither party shall stalk, follow, or threaten to harm, stalk or follow the other party. Neither party shall record (video/audio) or surveil one another." The consent order also provided as follows:

> The dismissal shall in no way limit either party's right
> to seek or obtain a [TRO] based upon any future acts of

A-1748-23

> domestic violence alleged to be perpetrated by the other. Moreover, said dismissal shall not foreclose either party from utilizing or referencing any past incidents of domestic violence, this civil restraints order, and any violations thereof, and the [TRO] entered in this matter in any future application made under the [PDVA] or in the matrimonial matter.

The consent judgment established a nesting arrangement whereby each party would have their parenting time with the child and occupy the former marital residence based on a shared schedule until the marital residence sold. Pick up and drop off would occur at the child's daycare between 9:00 and 9:30 a.m. The consent judgment contained a holiday schedule, which the parties agreed would supersede regular parenting time and memorialized that each party would enjoy up to six weeks of summer vacation with the child per year.

The parties' families hailed from a small Mediterranean island, and so they agreed they would each be entitled to exercise twenty-four consecutive days in their ancestral homeland each summer. I.L. had the right to first select her vacation weeks in odd years, and S.A. had priority in the even years. If a party intended to spend their summer vacation parenting time on the island, "that party shall notify the other no later than March 15th during [their] priority year (unless otherwise agreed to by the parties in writing, text message/email shall suffice), of the dates and itinerary of the trip." Further,

A-1748-23

[t]he non-priority party shall notify the other party of the dates and itinerary of any vacation parenting time they intend to exercise during the summer, with the understanding that with respect to traveling to [the ancestral homeland], the party whose priority year it is shall be entitled to first choose and exercise one . . . block of twenty-four . . . plus three . . . consecutive days of vacation parenting time in [the ancestral homeland], including travel time.

However, "[t]he party with priority shall not elect to spread [their] designated vacation parenting time such that it would block the other party from having their agreed amount [of] time in [the ancestral homeland] in accordance with the terms of this [a]greement." The parties also agreed "[t]he non-priority party may not interrupt the other party's designated block of twenty-four . . . consecutive days during [their] priority year unless otherwise agreed to by the parties in writing."

The parties were divorced in March 2019. They entered a marital settlement agreement (MSA), which incorporated the consent judgment and the consent order for civil restraints.

Following the divorce, S.A. filed a post-judgment motion in the matrimonial matter, which led to entry of an order dated July 12, 2019. In relevant part, the order required the parties to inform each other of address changes because they were entitled to know where their child was residing.

5

In February 2020, the Middlesex County Prosecutor's Office moved to forfeit S.A.'s weapons and revoke his firearms privileges. The State alleged S.A. suffered from alcoholism and was a habitual drunkard who presented a danger to I.L. and the community at large. I.L. and her mother testified for the State at the hearing. S.A. testified on his own behalf and adduced testimony from his uncle. The court concluded the State had not met the burden of proof and dismissed the weapons forfeiture case.

On July 12, 2023, I.L. filed a domestic violence complaint, which she amended two days later, alleging harassment and stalking. The complaint contained several predicate acts, which I.L. asserted occurred on June 16, 20, 23, and July 5, 6, and 12, 2023. I.L. alleged that while the parties were at the child's annual physical on June 16, S.A. referred to I.L. using a name, which combined the first half of her mother's name, I.L.'s last name, and "sh[*]t." On June 20, I.L. alleged she was enjoying parenting time when S.A. texted her nine times questioning where she was taking their child and what they were doing. On June 23, S.A. texted I.L. "telling her she needs mental help," referring to her by the name he made up ending in "sh[*]t" and making up a second name, which meant stupid in the parties' mother tongue. S.A. also claimed I.L. had Munchausen syndrome by proxy, and said I.L. "needs mental health, only a robo

computer sends more meaningless emails than you do[, y]ou don't comprehend anything. . . . I am not surprised . . . at all that you are going to be 'that mom'— you make everything in life difficult so why not this. You want to mess with the child's mind."

On July 5, I.L. claimed she arrived at 8:30 a.m. to exchange their child for parenting time, but S.A. did not appear. She alleged the parties texted back and forth, but S.A. refused to produce the child. When I.L. called the police, S.A. produced the child.

On July 6, I.L. alleged S.A. "got into [her] face, inches from [her] face, during the child's birthday, and said condescendingly[, ']is it okay if I have a goodie bag, when I threw . . . the child a party we had plenty of goodie bags.'" I.L. claimed S.A.'s comments were made tauntingly.

On July 12, I.L. claimed that at the child's dentist appointment, S.A. was nitpicking about issues when "out of nowhere the child volunteered that [S.A.] would be on . . . vacation" on the ancestral island at the same time as I.L. She would have changed her trip to avoid S.A. if she knew he was going as well.

I.L.'s complaint alleged a long history of domestic violence. In 2011, I.L. alleged S.A. strangled her "with one hand causing [her] to have trouble breathing." In 2015, S.A. said "he would cut [I.L.'s] body up in little pieces and

A-1748-23

nobody would find" her. In "May and July/Aug[ust] 2016[, S.A.] swung [a] knife around in front of [I.L.] and told [her] he was going to gut her."

In the fall of 2018, S.A. "got into [I.L.'s] face telling [her] I will get you." I.L. also claimed S.A. has been following her to the ancestral island for the past five years and "parks outside [of] where [she] stays" on the island.

I.L. alleged that since 2021, S.A. refused to pay bills, causing her to "receive letters with bills." On March 13, 2023, S.A. called I.L. "mentally retarded and that [she] has Munchausen [syndrome] by proxy. [S.A.] called [I.L.] an annoying troublemaker."

S.A. also filed a domestic violence complaint and obtained a TRO on July 14, 2023. He alleged I.L. harassed him in June 2023 by sending him numerous emails regarding their son's medical bills, which he already had access to, and continued to message him after he told her to stop. On June 20, 2023, S.A. alleged I.L. texted him about custody and refused to tell him their son's whereabouts. On July 5, 2023, I.L. sent S.A. numerous messages demanding to change the pick up and drop off time for parenting time, and called the police and falsely accused him of withholding the child. On July 12, 2023, S.A. claimed I.L. threatened to withhold the parties' son from him during their trip to their ancestral island.

S.A.'s complaint recited a history of domestic violence dating back to 2013. That year, he claimed I.L. accused him of cheating and broke his windshield by kicking it. He claimed she punched him on two occasions, causing cuts and bruising to his face. S.A. alleged I.L. pressed a knife to his stomach and said: "Tell me you cheated on me and I will cut you and kill you."

In 2016, S.A. claimed I.L. repeatedly slammed the bedroom door and broke its molding. That year, I.L. took the parties' child and "threatened not to go back." On a separate occasion, she had her mother drive around with the child for three hours without disclosing his location to S.A. On April 2, 2016, I.L. came home angry, kicked and damaged the garage door, and threatened to kidnap their son. S.A. claimed I.L. falsely reported to police that he was present in the former marital residence without permission in violation of a court order. In 2017, I.L. filed a similar false report, which led to S.A.'s arrest.

In 2022, S.A. alleged I.L. falsely reported to police that he was stalking her. She made another false report in July of that year, which caused police to interview him. On September 29, 2022, S.A. claimed I.L. changed their son's enrollment in a program without telling him in violation of their MSA.

The trial judge made detailed oral findings at the conclusion of the domestic violence trial. He found I.L. and her mother credible, S.A. not

9

credible, the former sister-in-law's testimony less than credible, and the acquaintance's testimony truthful, but of no moment.

I.L.'s mother testified from her experience of living with the parties for a period while I.L. was pregnant. She recounted S.A. calling I.L. various names. On one occasion, he was criticizing the way she was cleaning up a wet basement floor, and his comments caused her to flee the residence. I.L.'s mother then sat down with S.A. and heard him say he would cut I.L. up and described how he would do it. The mother noted S.A.'s conduct worsened when he consumed alcohol. The judge credited the mother's testimony that S.A. called I.L. names such as "stupid, bimbo, ugly, moron, crazy, idiot, psycho, . . . f[**]king p[*]ssy, [and f**king] moron" and threatened her games would end soon.

The judge found I.L.'s mother did not have "an axe to grind" and lacked "an ulterior motive." She witnessed much of the conduct she testified to, which caused her to become concerned for I.L.'s safety, and in turn, to contemporaneously memorialize it in an email diary in 2018. Although S.A. denied much of what I.L. alleged, and the conduct described by I.L.'s mother, the judge found the mother was "highly credible" because she had no reason to lie. The mother had no "inkling [her 2018 diary] would become part of a court case" five years later. The judge concluded the mother was truthful about her

10

reasons for compiling the diary, and she did not prepare it for litigation purposes. S.A. admitted some of the name calling, but claimed it was in jest. The judge concluded the name calling was domestic contretemps.

Aside from lacking in credibility, the trial judge found the former sister-in-law's testimony was not very helpful. She testified regarding an incident where police attempted to served I.L.'s brother with a TRO on behalf of the former sister-in-law. The purpose of the testimony was to show I.L. was not a truthful person because she did not let police into her brother's house or otherwise help them find her brother to serve him. On cross-examination, the sister-in-law was confronted with evidence of her own lack of credibility and that her TRO had been dismissed following a trial. The judge noted "she squirmed a lot . . . [s]he wasn't direct. Her body language was poor[,] and [he] found that to mean that perhaps some of her testimony was rehearsed or contrived . . . ."

The trial judge found the June 20 incident was not domestic violence but instead domestic contretemps, discord, and disagreement over parenting time. While S.A.'s conduct was bothersome to I.L., the judge concluded it was a "kind of normal back and forth bickering." Likewise, the July 5 incident was a

11

parenting time dispute. The parties' email exchange regarding the incident were "mostly if not all domestic contretemps."

The acquaintance testified to his interactions with the parties at the son's extracurricular activities and the July 6 birthday. The witnesses' testimony was generally that he did not observe S.A. engage in problematic behavior and saw nothing at the birthday party. Although the judge found his testimony truthful, it was not helpful to determine whether there was domestic violence because the judge questioned whether the witness would have seen everything during the party. He noted the witness did not attend the party "looking for anything." The judge concluded his testimony "leaves little to this case at all."

The trial judge found I.L.'s testimony "believable[,] . . . unrehearsed, [and] unscripted." He recounted her detailed testimony regarding why she was scared and in fear. She stated "I don't act scared. I am scared." The judge found this testimony compelling and noted he had never seen or heard a witness make such a statement before. He noted she was emotional and shaking during her testimony. Her voice cracked, and "[s]he used certain hand gestures[ and] teared up. [She t]estified frankly . . . with a plea for help in so many words and [he] found . . . she needed a[n FRO]." The judge credited I.L.'s testimony that "she's in fear; she believes she's in immediate danger and . . . she had put up with this

to save their marriage . . . and she was afraid because [S.A.] had told her . . . he would kill her, cut her body up in tiny pieces and no one would ever find it."

The trial judge found that some of the names S.A. called I.L. were insulting and "that people . . . in relationships do that all the time." However, there was "corroborating evidence to show that statements such as [']I'll cut your body up in little pieces and no one will find it,['] . . . [']I'll carve you up, I'll do this with a knife,['] . . . [']f[**]king kill you[,] you should go die[']" coupled with the "prior history between the parties . . . shows . . . [S.A.] was abusive under the [PDVA.]"

The trial judge remarked although S.A. was "a very intelligent person," his testimony was "calculated." The judge pointed to the July 12 incident at the dentist's office when I.L. first learned S.A. intended to travel to the parties' ancestral island at the same time she was going with their son. The evidence showed S.A. had booked his flight on June 18, 2023, but never informed I.L. until their son mentioned it at the dentist's office on July 12. The judge found S.A. "booked those tickets . . . and waited until she was about to leave to tell her that." S.A.'s testimony was "not direct at times." The judge "found him to smirk, sometimes smile sarcastically. He was . . . auditioning at times."

The trial judge dismissed S.A.'s complaint because none of its allegations constituted harassment under the PDVA. The testimony did not establish I.L. intended to "bother, annoy, [or] harass" S.A. The judge found there was "a lot of discord in parenting time." The parties interpreted the consent judgment "in ways that they saw fit to benefit them or to wiggle out of certain days for [parenting time]." However, the "dysfunction between the parties in coparenting" was not domestic violence.

Even if S.A. had proven harassment, his complaint did not establish he needed an FRO to protect him from immediate danger. S.A. "never said he was in fear" of I.L. and testified he would have no problem traveling on the same plane with her to the ancestral island. "[H]e said he needed [an FRO] to stop or prevent government agencies from interfering with his parenting time . . . to effectively co-parent and to access his vacation home" on the ancestral island.

Addressing I.L.'s complaint, the judge found the June 16 incident when S.A. referred to I.L. using a made-up name and sh[*]t was not harassment. Nor was the June 20 incident for the reasons we previously discussed.

The trial judge then pivoted and discussed Cesare v. Cesare, 154 N.J. 394 (1998). He noted the evidence adduced bore a "striking similarity to . . . Cesare" where the Court held that "an ambiguous incident qualifies as prohibited conduct

based upon finding [of domestic] violence in the parties' past."  The judge credited I.L.'s testimony that S.A. "got in her face in 2018 . . . and then swung [a] knife, told her that he would carve her body up in little pieces and that she wouldn't be found."  This incident was "not domestic contretemps by any stretch of the imagination."

The judge similarly credited I.L.'s testimony that when she was pregnant, S.A. threatened to "carve the baby out of her, kill her with a knife, called her ugly, [a] f[**]king idiot, [and told her that] she should just go kill herself."  I.L.'s testimony that S.A. had threatened her in June 2016 while she was nine months pregnant because she was not mopping a wet basement floor correctly was also credible because it caused her to run out of the house.  The judge also believed I.L.'s testimony that S.A. had choked her in 2011.  She described how he "grabbed her neck with one hand and then went to a two-hand choke in the bedroom[,] and one time had her up against the wall."

The judge found I.L.'s case was "strikingly similar" to <u>Cesare</u> because there the defendant described in graphic detail what he would do to the plaintiff, and there was corroborating evidence from the plaintiff's father that the defendant had confided in him that he had threatened to kill the plaintiff in the past. I.L.'s case was "eerily similar" because "her mother testified that she heard

15

these threats and had heard them from [I.L.]"  The judge reasoned he could not ignore the corroborating evidence.  He found "it's clear by a preponderance of the evidence at least that in fact [S.A.] intended to harass [I.L.]"  S.A.'s statements "in light of the . . . extensive history whereby he went above and beyond to tell her that he would essentially take care of her in such a way that she wouldn't be found" were not innocuous to I.L.

The trial judge reached the same conclusions regarding the July 5 goodie bag incident at the son's birthday party.  Although S.A. getting into I.L.'s face and making a taunting gesture with the goodie bag would "in some cases [be] childish," the parties' history established it was harassing.  Likewise, the July 12 incident constituted harassment because I.L. testified S.A. brushed up against her while the parties argued over the fact S.A. never told her he would be on the ancestral island at the same time as her.

The trial judge also concluded I.L. proved S.A. stalked her in violation of the consent order for civil restraints by not telling her of his travel plans until it was too late.  He credited I.L.'s testimony and her mother's, which described in detail how S.A. had walked by her apartment on the island many times to harass her.  The judge stated:  "I think it's clear that [S.A.] intended to irritate [I.L.] perhaps even to intimidate her a little bit.  He couldn't let go and it was certainly

16

[meant] to disturb her that he was going to [vacation] at the same time . . . she did." The judge concluded S.A.'s statements on June 23, and conduct during the July 6, and July 12 incidents constituted stalking because it was course of conduct intended to put I.L. in fear for her safety or suffer emotional distress.

Part of S.A.'s defense was to paint a narrative that I.L. was using the domestic violence proceedings to gain an upper hand in the matrimonial matter. The judge found the opposite. He noted, "[t]here is no legal proceeding . . . pending here." I.L. "testified at least three times . . . that she want[ed] her son to have a relationship with [S.A.] and she was very believable about that[;] she just doesn't want to be a part of [it]."

The trial judge concluded I.L. proved the June 23, July 6 and 12, incidents were predicate acts of harassment and stalking in light of the prior history of domestic violence. The evidence showed I.L. needed an FRO to protect her because I.L.'s testimony and her mother's established "good cause for her to fear for her life, health and well-being whether it's physical or mental."

I.

S.A. argues the trial judge abused his discretion because there were numerous contradictions in the testimony of I.L. and her mother, which did not support a finding of a history of domestic violence, and in turn, an FRO under

A-1748-23

the rubric of <u>Cesare</u>. He claims there were legitimate reasons for him to travel to the ancestral island at the same time as I.L., namely: to exchange their son for parenting time without him having to fly back and forth from Europe; that the MSA entitles him to vacation with the son on the ancestral island, creating a natural overlap with both parties being on the island; and he has legitimate reasons to travel to the ancestral island to see his own family and tend to his property interests on the island. He asserts there was no evidence adduced of stalking occurring in New Jersey, and he could not be liable for stalking on the ancestral island because the MSA and the consent order entitle him to always know where their son is.

S.A. disputes there was a predicate act of domestic violence on July 12 at the dentist's office. He went to the office to drop the parties' son off for his appointment and remained there to play with him because I.L. went in for her own appointment, leaving their son alone in the waiting room. S.A. did not stay at the dentist's office to deliver the news to I.L. that he would traveling to the ancestral island at the same time as her.

S.A. challenges I.L.'s mother's testimony that I.L. fled their home in 2016 after S.A. threatened to gut her and had no place to stay. He asserts I.L.'s mother contradicted herself because I.L. was able to stay with her father. The fact the

18

father lived in an age-restricted community and I.L. could not live with him was of no moment because I.L.'s mother clearly contradicted herself and exaggerated the severity of I.L.'s reaction for purposes of the domestic violence hearing.

S.A. disputes the judge's finding that the mother's diary of the incidents between the parties was not contrived for the hearing. He further contests the findings that instances such as the July 6 predicate were domestic violence because he was lawfully permitted to participate in the son's activities and life events.

S.A. claims the trial judge ignored the fact that he prevailed at the weapons forfeiture hearing where I.L. had asserted the same history of domestic violence, which the court rejected. He argues res judicata barred I.L. from raising the alleged history of domestic violence because "the parties' history up to February 2020 was already litigated in [his] favor after the Family Part heard the same testimony from [I.L.] and [her] mother."

S.A. alleges the trial judge erred when he dismissed his domestic violence complaint because he established a need for the protection of an FRO by adducing evidence that he was afraid of I.L. The judge also ignored text messages showing I.L. gave her brother carte blanche to assault S.A. when the parties were vacationing separately on the ancestral island.

19

S.A. disputes the trial judge's finding that I.L. was not using the domestic violence proceedings as a sword to gain the upper hand in the matrimonial proceedings. He claims the FRO has real life consequences that will: impact him personally and professionally; make it difficult for him to co-parent; ruin his reputation in their son's school and community; and put "him in even greater fear of more consequential random and frivolous police visits" notwithstanding the fact he testified he avoids contact with I.L. S.A. points to several instances in the record as proof I.L. is unafraid of him, including: the former sister-in-law's testimony that she never heard I.L. say she was afraid of S.A.; and the fact I.L. was willing to be alone with S.A. for parenting time exchanges and school events, which contradicted her claim she needed her fiancé present for protection.

S.A. challenges how the trial judge weighed the evidence to determine credibility. He claims the judge erred when he admitted evidence of his infidelity because it had nothing to do with the proceeding. At the same time, the judge ignored evidence showing I.L. lacked credibility when she interacted with the police trying to serve her brother with a TRO.

II.

Our review of a trial judge's fact-finding function is limited. Cesare, 154 N.J. at 411. A judge's findings of fact "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). We will not disturb a judge's factual findings unless convinced "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Rova Farms, 65 N.J. at 484 (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

Deference is particularly warranted where, as here, "the evidence is largely testimonial and involves questions of credibility." Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is "because the trial [court] 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). We accord deference to the Family Part's fact-finding "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413. Likewise, the decision to

admit or exclude evidence "is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

The PDVA was intended "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. "It is well settled that to obtain an FRO under the [PDVA], a plaintiff must not only demonstrate defendant has committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a)(1) to (19), but also that a restraining order is necessary for [their] protection." C.C. v. J.A.H., 463 N.J. Super. 419, 429 (App. Div. 2020). As a result, our Supreme Court has held "[t]he requirement that a court consider the past history of the parties, in the context of an allegation of . . . harassment, or other domestic violence, comports with the legislative intent of the statute." Cesare, 154 N.J. at 405.

The history of domestic violence is important "[b]ecause a particular history can greatly affect the context of a domestic violence dispute." Ibid. Therefore,

> trial courts must weigh the entire relationship between the parties and must specifically set forth their findings of fact in that regard. Furthermore, in making their determinations, trial courts can consider evidence of a defendant's prior abusive acts regardless of whether

22

> those acts have been the subject of a domestic violence adjudication.
>
> [Ibid. (emphasis added) (citing Roe v. Roe, 253 N.J. Super. 418, 431-32 (App. Div. 1992)).]

With these principles in mind, we reject S.A.'s arguments, which ostensibly ask us to second-guess the judge's factual and credibility findings. The substantial credible evidence supports the judge's findings on both the predicate acts of domestic violence and the parties' history of domestic violence.

That S.A. either denied I.L.'s allegations, or advanced a narrative that he had perfectly legitimate reasons for his conduct and actions, is not a reason for us to overrule the judge's reasoning. Nor is S.A.'s assertion the findings from the weapons forfeiture hearing were res judicata. As Cesare noted, a trial court can consider evidence of past acts of abuse regardless of whether they have been the subject a domestic violence adjudication. Ibid. The weapons forfeiture hearing was not even a domestic violence adjudication.

Res judicata did not apply because I.L. was not a party in the weapons forfeiture case, but instead one of the State's witnesses, and lacked "privity with those in the first action." Nolan v. First Colony Life Ins. Co., 345 N.J. Super. 142, 153 (App. Div. 2001). The doctrine of res judicata bars the re-litigation of claims or issues. Velasquez v. Franz, 123 N.J. 498, 505 (1991). The issues and

23

claims in the weapons forfeiture hearing were different than the domestic violence hearing. The former proceeding is a remedy the State may pursue incident to weapons seized under the PDVA. N.J.S.A. 2C:25-21(d)(3). A domestic violence proceeding is much broader in its scope, purpose, and considerations. N.J.S.A. 2C:25-18.

The evidence also demonstrated I.L. proved she needed an FRO for S.A. to leave her alone. "At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." State v. Hoffman, 149 N.J. 564, 584 (1997).

On the other hand, the record amply supports the judge's finding S.A. did not require the protection of an FRO. None of the N.J.S.A. 2C:25-29(a)(1) to -(7) factors supported granting S.A. an FRO. S.A.'s testimony not only failed to demonstrate a fear of I.L., its tone, evident to us even on a cold record, in addition to the judge's detailed credibility findings do not bespeak fear or a need for an FRO.

In Corrente v. Corrente, we expressed that trial courts must parse childish conduct or domestic contretemps from the serious conduct the Legislature sought to prevent under the PDVA, in order that the invocation of the PDVA

does not trivialize the plight of true victims of domestic violence or create "the potential for unfair advantage to a matrimonial litigant." 281 N.J. Super. 243, 250 (App. Div. 1995). In Murray v. Murray, we urged that courts be cognizant of "the serious policy implications of permitting allegations of [contretemps] to be branded as domestic violence and used by either spouse to secure rulings on critical issues . . . particularly when aware that a matrimonial action is pending or about to begin." 267 N.J. Super. 406, 410 (App. Div. 1993).

The record is devoid of evidence showing I.L. intended to use the FRO to gain the upper hand. The parties were divorced many years before these domestic violence proceedings. They entered a comprehensive MSA, whose consent judgment on custody and parenting time and consent order for civil restraints enabled them to parent their child pursuant to clear rules and without much direct physical interaction. As a result, there was very little business to be conducted between the parties and nearly no post-judgment history evidencing I.L. was aiming to curtail, usurp, or modify S.A.'s parenting time or his rights as a joint custodial parent. Notably, the FRO did not fundamentally alter or decrease S.A.'s parenting time or custody, and instead directed how the parties should communicate and established safe places for parenting time exchanges, both stateside and on the parties' ancestral island.

Finally, although S.A.'s notice of appeal listed the January 30 and February 5, 2024 orders, he did not brief issues directly regarding these orders. An issue not briefed is deemed waived. Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014). For these reasons, we decline to address these orders. To the extent we have not addressed an argument raised on appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in A-1748-23 and affirmed in A-1773-23.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division